UNITED STATES v. GREEN (five cases).

(District Court, N. D. New York. March 13, 1905.)

Nos. 23,927, 23,940, 23,928, 23,961, 23,960.

1. CRIMINAL LAW—REMOVAL OF DEFENDANT TO ANOTHER DISTRICT FOR TRIAL.—SUFFICIENCY OF COMPLAINT.

In proceedings under Rev. St. § 5440, as amended by Act May 17, 1879, c. 8, 21 Stat. 4 [U. S. Comp. St. 1901, p. 3676], for the removal of a defendant from a district where found to another district for trial on an indictment, a complaint which has the indictment attached as a part thereof is as broad as the indictment, and is sufficient if the indictment charges an offense, and it is immaterial what the offense may be designated in the complaint.

2. SAME—DESIGNATION OF OFFENSE—BRIBERY OF UNITED STATES OFFICER.

The offense denounced by Rev. St. § 5451 [U. S. Comp. St. 1901, p. 3680], is properly described in a complaint as bribery of an officer of the United States, being so designated in the marginal note to the section, which was a part of the Revised Statutes when the same were enacted.

3. SAME—WARRANT—DESCRIPTION OF OFFENSE.

A warrant issued by a commissioner for the arrest of a person for removal to another federal district for trial is sufficient, if it sets forth the offense charged in the complaint in general terms, and need not recite all the acts alleged to have been done by defendant to constitute the offense.

4. SAME—PROBABLE CAUSE—EVIDENCE.

In a proceeding for the removal of a defendant to another federal district for trial on an indictment charging him with a violation of Rev. St. § 5451 [U. S. Comp. St. 1901, p. 3680], by bribing an officer of the postal department to use his official position to promote the sale to the government of articles in which defendant was interested as agent, evidence that defendant and such officer were personally acquainted, that the sales were made by defendant, who in soliciting the same talked with such officer and his superiors, who in fact made the purchases, and that after receiving his commissions on the sales he paid a similar amount to such officer, without any explanation of the reason for such payments, or evidence showing that they had any connection with the sales, is not sufficient, aside from the indictment itself, to show the commission of the crime charged, or to establish probable cause to believe the defendant guilty.

5. SAME.

Probable cause to believe a defendant has committed a crime, such as will warrant his removal to another district to be tried therefor, is not established by evidence which is as consistent with his innocence as with his guilt, although it may afford ground for a suspicion or conjecture that the offense was committed.

6. SAME—INDICTMENT AS EVIDENCE—PRIMA FACIE CASE.

Under the law, as determined by the Supreme Court, that an indictment is prima facie evidence of probable cause in a proceeding for the removal of a defendant to another federal district for trial thereon, the effect of the indictment, if introduced in evidence in such proceeding, is not weakened by the fact that the government introduces additional evidence, which is in itself insufficient to establish probable cause, provided such evidence does not contradict the facts alleged in the indictment.

7. SAME—SUFFICIENCY OF INDICTMENT—BRIBERY OF UNITED STATES OFFICER.

An indictment under Rev. St. § 5451 [U. S. Comp. St. 1901, p. 3680], making it an offense to tender "any contract, undertaking, obligation,

gratuity, or security for the payment of money, or for the delivery or conveyance of anything of value, to any officer of the United States," with intent to influence his decision or action on any matter pending or which may be brought before him in his official capacity, which charges the defendant with bribing an officer, etc., by tendering to him "a certain obligation for the payment of money, to wit, the personal check of him, the said [defendant], drawn upon the Knickerbocker Trust Company of New York City, N. Y., in favor of the said [officer], for the sum of three hundred and twenty-five dollars, with intent," etc., but which does not set out the check, nor give its date or contents, nor allege that the trust company named was in existence or engaged in the banking business, is insufficient to charge the offense stated, because it does not show the check to have been an obligation for the payment of money, nor so identify it as to protect the defendant in case of a subsequent indictment for the same offense; and such indictment is insufficient to sustain proceedings for the removal of defendant from another district for trial thereon.

8. INDICTMENT—CONSTRUCTION—COMMON-LAW WORDS OR PHRASES.

Where common-law words or phrases are used in an indictment or information, they must be given their common-law meaning.

9. BRIBERY OF UNITED STATES OFFICERS—CONSTRUCTION OF STATUTE—"OBLIGATION FOR PAYMENT OF MONEY."

A bank check is not an "obligation for the payment of money," within the legal meaning of such term as used in Rev. St. § 5451 [U. S. Comp. St. 1901, p. 3680], providing for the punishment of bribery of United States officers.

10. SAME—ELEMENTS OF OFFENSE—TENDER OF VOID INSTRUMENT.

The tendering by a person of his personal check, drawn on a bank and payable to an officer of the United States, to such officer, with intent thereby to affect his official action, does not constitute the crime of bribery, under Rev. St. § 5451 [U. S. Comp. St. 1901, p. 3680], since a check made and delivered for such illegal purpose is void, and not within any of the classes of instruments enumerated in the statute.

11. INDICTMENT—AVERMENT OF INTENT.

Where intent is of the essence of an offense as defined in the statute, it must be averred in an indictment for such offense.

12. CONSPIRACY TO DEFRAUD UNITED STATES—SUFFICIENCY OF INDICTMENT.

An indictment under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], for conspiracy to defraud the United States, which avers that defendant and an officer of the United States "unlawfully did conspire, combine, confederate, and agree together * * * knowingly to defraud the said United States in the manner following, that is to say," followed by an averment that defendant promised and agreed with said officer to pay him a commission on the price of each and every one of certain articles which should be purchased by the United States by procurement of such officer, fairly imports an assent or agreement on the part of the officer, and is sufficient in such respect to charge conspiracy, although the officer's assent is not directly averred.

13. SAME.

Indictments for conspiracy to defraud the United States, under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], considered, and *held* sufficient for the purposes of a proceeding for the removal of the defendant from another district for trial and to establish probable cause in such proceeding.

14. SAME.

An indictment charging a defendant with a conspiracy to "commit an offense against the United States" must state an agreement to do acts which, if done, would constitute a specific offense; and where an intent is an essential part of such offense, as defined by the statute, such intent must be averred.

**15. CRIMINAL LAW—REMOVAL OF DEFENDANT TO ANOTHER DISTRICT—VALIDITY OF INDICTMENT.**

Where it is sought to remove a defendant from one federal district to another for trial on an indictment, the question of the validity of such indictment in matters of substance may properly be raised and determined in the district of the arrest in habeas corpus proceedings.

## On Habeas Corpus, Certiorari, and Petition for Warrants of Removal for Trial.

The defendant, George E. Green, of Binghamton, N. Y., in the Northern District of New York, having been indicted by five several indictments presented by the grand jury of the Supreme Court of the District of Columbia, holding a criminal term, and not being within such District of Columbia, was arrested at Binghamton, N. Y., in the Northern District of New York, by the United States marshal of said district, on warrants issued by Charles S. Hall, Esq., a United States commissioner in and for said district, issued pursuant to the provisions of section 1014 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 716]. That section reads as follows:

"Sec. 1014. For any crime or offense against the United States, the offender may, by any justice or judge of the United States, or by any commissioner of a circuit court to take bail, or by any chancellor, judge of a supreme or superior court, chief or first judge of common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where he may be found, and at agreeably to the usual mode of process against offenders in such state, and at the expense of the United States, be arrested and imprisoned, or bailed, as the case may be, for trial before such court of the United States as by law has cognizance of the offense. Copies of the process shall be returned as speedily as may be into the clerk's office of such court, together with the recognizances of the witnesses for their appearance to testify in the case. And where any offender or witness is committed in any district other than that where the offense is to be tried, it shall be the duty of the judge of the district where such offender or witness is imprisoned, seasonably to issue, and of the marshal to execute, a warrant for his removal to the district where the trial is to be had."

It will be noted that this section, enacted by Congress September 24, 1789 (1 Stat. 91, c. 20), and amended August 22, 1842 (5 Stat. 516, c. 188 [U. S. Comp. St. 1901, p. 716]), provides that an offender against the criminal laws of the United States, whether indicted or not, is to be arrested, or imprisoned, or bailed, as the case may be, for trial before such court of the United States as by law has cognizance of that offense, "agreeably" (that is, in accordance with) "to the usual mode of process against offenders in such state." This means, and the decisions are uniform, that the offender against the laws of the United States is to be arrested, imprisoned or bailed, and held for trial in the same manner and under the same procedure adopted and fixed by the laws of the state in which found for the arrest, bailing, examination, etc., of offenders against the laws of such state. In short, Congress has adopted, for these purposes, the laws of each state as to offenders found within its borders. The decisions of the state courts in interpreting such statutes will, of course, apply and usually govern.

The defendant, Green, having been taken before Commissioner Hall, demanded an examination, and, being represented by counsel, such examination was held on each indictment, or, more properly speaking, on each complaint; each complaint being founded on a separate indictment. The result of these examinations was that on the 18th day of December, 1893, defendant, Green, was held on each charge or indictment, and required to give bail in the sum of $4,000 in each case for his appearance, etc., before the Supreme Court of the District of Columbia, then and there to stand trial and answer what might be required of him, and in default of such bail to stand committed to the custody of the marshal of the District pending an application to the district judge of said District for a warrant of removal, in each case, pursuant to section 1014 of the Revised Statutes [U. S. Comp. St. 1901, p. 716] above quoted. On the same day the defendant, George E. Green, in the custody of

the marshal, was taken before the District Judge of the Northern District of New York, and the United States Attorney for said district applied then and there, pursuant to the section of the Revised Statutes above quoted, for warrants for the removal of said Green to the District of Columbia, where the trial of said Green under said indictments must be had.

The defendant, Green, by his counsel, opposed the granting of such warrants, and applied on petitions and papers in due form and alleging many substantial errors and defects in the proceedings, as well as the invalidity of each of the indictments and the absolute insufficiency of the evidence, including the indictments, to show the commission of a crime by the defendant, or probable cause to believe him guilty of the commission of any crime, for writs of habeas corpus to bring Green before the court for the purpose of inquiring into the legality of his arrest and detention by said marshal. He also applied for writs of certiorari to bring up the records in each case. These applications were not opposed, and such writs were duly issued, and the applications for warrants of removal were held pending the determination of the court on such writs of habeas corpus. The defendant was admitted to bail in the sum of $20,000, pursuant to section 1015 of the Revised Statutes [U. S. Comp. St. 1901, p. 718], requiring absolutely that bail shall be taken upon all arrests in criminal cases where the offense is not punishable by death.

The hearings on the returns to the writs were not completed until late in July, 1904, and the cases were finally submitted in September of that year.

Geo. B. Curtiss, U. S. Dist. Atty., and M. D. Purdy, Asst. U. S. Atty. Gen.

John B. Stanchfield, Frederick Collin, and Theodore R. Tuthill, for defendant.

RAY, District Judge (after stating the facts). The questions arising on the voluminous indictments and records in these cases are important, not only to the government, but to the defendant, and have received consideration such as their importance would seem to demand. The defendant, Green, is held under five indictments, as follows:

No. 23,927, dated July 17, 1903, charging that in the District of Columbia, about December 11, 1901, said Green bribed one George W. Beavers, an officer of the United States government, in violation of section 5451 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3680], in connection with "Bundy Time Recorders," an instrument for recording the time of government employés, and alleged to have been sold to the government through the joint action of Green and Beavers.

No. 23,940, dated October 1, 1903, charging that in the District of Columbia, on or about the 1st day of November, 1901, George W. Beavers, an officer of the United States government, and George E. Green, the defendant, unlawfully conspired, combined, confederated, and agreed together, and with divers other persons to the grand jury unknown, knowingly to defraud the United States in the manner set forth in such indictment, in violation of section 5440 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3676]. The indictment charges that this conspiracy to defraud the government related to the Bundy time recorder.

No. 23,928, dated September 17, 1903, charging that in the District of Columbia, on or about the 1st day of November, 1901, the

said Beavers and Green conspired to commit an offense against the United States of America, in violation of section 5440 of the Revised Statutes of the United States, and in connection with the Bundy time recorder.

Reference is made to one count only in each of these indictments, as reference to the others is unnecessary.

No. 23,961, dated October 5, 1903, charging that in the District of Columbia, on or about the 6th day of October, 1900, the defendant, George E. Green, and George W. Beavers and Willard D. Doremus, unlawfully conspired, combined, confederated, and agreed together and with divers other persons knowingly to defraud the United States in the manner set forth in the said indictment, and which conspiracy related to the purchase of what is known as the "Doremus Stamp Canceling Machine" for the government by said Beavers, through said Green and Doremus.

No. 23,960, dated October 5, 1903, charging that in the District of Columbia, on or about the 6th day of October, 1900, the defendant, George E. Green, and George W. Beavers, an officer of the United States government, and one Willard D. Doremus, entered into an unlawful and corrupt agreement whereby said Green and Doremus undertook and promised, on behalf of the corporation represented by them, to pay to said Beavers, for his own personal use and benefit from time to time, and while said Beavers continued to be an officer of the United States government, $25 for each canceling machine sold the government, and that thereafter the said Green and Doremus did make payments to the said Beavers in pursuance of said agreement.

It will be noted that indictment No. 23,927 charges Green with the bribery of Beavers in connection with the Bundy time recorder, in violation of section 5451 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3680]; that indictment No. 23,940 charges said Green with conspiracy to defraud the United States in connection with said Bundy time recorders, in violation of section 5440 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3676]; while indictment No. 23,928 charges said Green with conspiracy to commit an offense against the United States in connection with said Bundy time recorders, in violation of section 5440 of the Revised Statutes of the United States.

Section 5451 of the Revised Statutes [U. S. Comp. St. 1901, p. 3680] reads as follows:

"Sec. 5451. Every person who promises, offers, or gives, or causes or procures to be promised, offered, or given, any money or other thing of value, or makes or tenders any contract, undertaking, obligation, gratuity, or security for the payment of money, or for the delivery or conveyance of anything of value, to any officer of the United States, or to any person acting for or on behalf of the United States in any official function, under or by authority of any department or office of the government thereof, or to any officer or person acting for or on behalf of either House of Congress, or of any committee of either House, or both Houses thereof, with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, or with intent to influence

him to commit or aid in committing, or to collude in or allow, any fraud, or make opportunity for the commission of any fraud, on the United States, or to induce him to do or omit to do any act in violation of his lawful duty, shall be punished as prescribed in the preceding section."

Section 5440 of the Revised Statutes, as amended by Act May 17, 1879, c. 8, 21 Stat. 4 [U. S. Comp. St. 1901, p. 3676], reads as follows:

"Sec. 5440. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years, or to both fine and imprisonment, in the discretion of the court."

We will first consider the charges in relation to the Bundy time recorder, and that relating to bribery comes first in order. The defendant, Green, insists that the information or complaint made and filed with Commissioner Hall did not confer upon such commissioner jurisdiction of the subject-matter; that is, of the alleged transaction in the city of Washington in which it is claimed Green agreed to bribe and did bribe Beavers in one of the modes or manners pointed out in section 5451 of the Revised Statutes [U. S. Comp. St. 1901, p. 3680] above quoted. That information or complaint consists of the affidavit of one Walter S. Mayer, a post office inspector of the Post Office Department of the United States, and among other things he says, upon information and belief, that at the city of Washington, in the District of Columbia, United States of America, and on or about the 11th day of December, 1901, and at other times thereafter and before the finding of said indictment, the said George E. Green committed the crime of bribing one George W. Beavers, an officer of the United States, in violation of section 5451 of the Revised Statutes of the United States of America [U. S. Comp. St. 1901, p. 3680]. The affiant then gives the sources of his information and the grounds of his belief, among which sources of information and grounds of belief is an indictment, the one in question, a copy of which indictment, duly authenticated, was attached to such affidavit of said Mayer and made a part of the complaint. A bench warrant, issued out of the Supreme Court of the District of Columbia, directing the arrest of the defendant, Green, upon the charge embraced within the said indictment, was also attached to the affidavit. The complaint also sets forth that Green could not be found within the District of Columbia, but was then within the Northern District of New York.

As the indictment itself was attached to and made a part of this affidavit of Mayer, it is to be read into the affidavit and as a part of it. The Supreme Court of the United States has decided that, in these proceedings for the removal of a defendant from the district where found to another where indicted for trial under an indictment, the indictment itself is evidence against the defendant of probable cause, and may be put in evidence, and that, when standing alone, it is prima facie evidence of all the acts charged to have been committed by the defendant and of all matters properly stated therein.

If this indictment, duly authenticated and attached to the complaint, was evidence against Green on his examination, which followed his arrest, it is difficult to understand why it was not also evidence for the purposes of the information, and competent as a part thereof to charge the defendant with the commission of the offense, or one of the offenses, described in section 5451 of the Revised Statutes. I am of the opinon, and hold, that the complaint or information was as broad as the indictment itself, and that such information or complaint was sufficient to justify the arrest and holding of Green, if it charges the commission of a crime under the provisions of section 5451 of the Revised Statutes. The force of the affidavit of Mayer as a legal information is not at all broken by describing the offense of Green as that of bribing one George W. Beavers, an officer of the United States, in violation of section 5451 of the Revised Statutes, even if it be true, as claimed by the counsel for the defendant, that there is no such offense known to the law as "bribery of an officer of the United States." If the complainant gave the offense that name, but still charged the defendant with the commission of all the acts necessary to constitute the crime described in section 5451, it is all-sufficient. But I am of the opinon that the crime of "bribery of any United States officer"—that is, bribery of an officer of the United States—is an offense known to the law, and is the offense described in section 5451 of the Revised Statutes. The marginal note of such section reads: "Bribery of Any United States Officers." These marginal notes formed a part of the Revised Statutes when adopted by Congress, and are to be taken and read as a part thereof. See Act June 27, 1866, c. 140, 14 Stat. 74 [U. S. Comp. St. 1901, p. 3755], and Act June 20, 1874, c. 333, 18 Stat. 113 [U. S. Comp. St. 1901, p. 3757].

This complaint, to which was attached, as forming a part thereof, the indictment last above referred to, No. 23,927, and sworn to before Commissioner Hall, was filed with him, and such commissioner thereupon issued his warrant, in which it is recited that complaint is made—

"Charging that George E. Green, late of Binghamton, Broome county, in the state of New York, did on or about the 11th day of December, 1901, at the city of Washington in the District of Columbia, United States of America, in violation of section 5451 of the Revised Statutes of the United States, unlawfully commit the crime of bribing one George W. Beavers, an officer of the United States of America; and it appearing from the said complaint of Walter S. Mayer that an indictment was on the 17th day of September, 1903, duly found by the grand jury of the Supreme Court of the said District of Columbia against the said George E. Green for said offense, and that a bench warrant has been duly issued out of said court on said indictment for the arrest of said defendant, and it appearing further by said complaint that the said George E. Green is within this district, to wit, the Northern District of New York, now, therefore," etc.

I am of the opinion that this warrant was sufficient. It cannot be that in these proceedings it is necessary to set out in the complaint and again in the warrant all of the acts of the defendant alleged to constitute an offense under section 5451 [U. S. Comp. St. 1901, p. 3680]. I find no case so holding.

Again, the record shows that, on being arrested and taken before the commissioner, the defendant entered a plea of not guilty of the charge stated in the indictment, and demanded an examination as to whether there was probable cause to believe him guilty of the offense charged. Such examination was allowed by the commissioner. The government then gave evidence of identity. Further hearing was then adjourned to September 22, 1903, at which time the defendant's counsel moved that the complaint be dismissed and the defendant discharged, "on the ground that the indictment under section 5451 of the Revised Statutes of the United States, charging bribery, does not recite and allege facts sufficient to constitute a crime." This motion was denied. It will be seen that the sufficiency of the complaint was not in question in any other respect than that the indictment, made a part of the complaint, did not recite and allege facts sufficient to constitute a crime. At no subsequent stage of the proceedings before the commissioner was the sufficiency of the complaint or information questioned. I am of the opinion, and hold, that the only question raised and to be considered as to the sufficiency of the complaint is, does the indictment recite and allege facts sufficient to constitute a crime under section 5451 of the Revised Statutes of the United States?

The defendant insists that the evidence given by the government before the commissioner on his examination was insufficient to show the commission of a crime or to establish probable cause to believe that the defendant, George E. Green, was guilty of the alleged offense. I have read and re-read the evidence given before the commissioner on this charge, leaving out of consideration the indictment itself, and not reading it as a part of the evidence to establish the commission of an offense and to establish probable cause against the defendant, Green. Standing alone and unsupported by the indictment, the evidence given is insufficient to show the commission of the crime by Green or establish probable cause. Leaving out of consideration the indictment itself, the evidence produced shows that Beavers was an officer of the United States connected with the Post Office Department, among other duties having in charge the purchase of supplies of certain kinds for the use of the government in the department. His will or wishes were not absolute in regard to the purchase of these time recorders, but he had charge of the negotiations, and the officers above him having absolute control of the matter were usually guided by his judgment. Beavers had well-established and well-defined duties to perform in this regard. The defendant, Green, was a friend of Beavers, and had been for some years, and exercised some influence in securing his transfer from the position of post office inspector to that of clerk in the Post Office Department, and his subsequent promotion to the position of chief of salary and allowance division. There is not a particle of evidence that Beavers sought the transfer and promotion for any illegal purpose, or that Green aided the transfer or promotion for any improper purpose. The defendant, Green, represented the International Time Recording Company having

136 F.—40

these Bundy time recording machines for sale. The government had purchased some of these instruments and had some in use. The company and Green, representing it, were anxious to extend their sales, and Green for this purpose visited the Post Office Department, and from necessity conferred with Beavers, as well as others, on the subject. Beavers in the discharge of his duty necessarily conferred with Green. There is no evidence of any suspicious act or acts on the part of either. No word was uttered by either that would point to the commission or intended commission of any improper act. The contract made called for machines at the old price, and they were delivered by the company at the old price, and paid for. No person ever heard a remark from the lips of either Beavers or Green suggesting any agreement or understanding that Beavers was to be paid anything as a bonus or commission or compensation, or for his influence in connection with the purchase by the government of these time recorders. There is some evidence that at one time a suggestion was made to substitute another time recorder for the Bundy machine, and that Beavers interested himself to prevent such action. There is no evidence that he unduly exerted himself, or that he resorted to any improper or questionable means. He simply advocated the Bundy machine and spoke disparagingly of a change. There is no evidence that more machines were purchased than were needed by the government. Even if some officers at the head of some departments did not desire them, it would not argue that the machines were not needed, or that they were not a good thing for the government. With equal force might it be said that these officers did not desire a record of the attendance of the employés in these departments.

The evidence shows that, after the contract made under Beavers had been in force for some little time, Green, who had charge of the sale of these machines for the company, drew his commissions from the company by check and deposited same to his own credit in his own bank account; that he then on the same day, or within a day or so, in some instances, drew a check against his own account for the same amount; and that within a day, or two, or three, very soon, Beavers' bank account would be credited with this sum and Green's account charged therewith. If these checks drawn by Green on his own account passed to Beavers, there is no evidence that they passed direct. For aught that appears they may have passed through other hands and for a variety of purposes. There is no evidence that Green did not owe Beavers, or that they did not have other business deals which called upon Green to pay money to Beavers. When one person delivers his check to another, the legal presumption is that the check is drawn and delivered in payment of a debt. In this case it is regarded as established that Green paid money by means of his check to Beavers. It is regarded as established that in some instances Green paid to Beavers the amount of his (Green's) commissions received from the Time Recorder Company as he received them from the company. What are the conclusions demanded by the government from these facts? They,

are the following: (1) That Green corruptly agreed with Beavers that, if he would use his influence with the Post Office Department and induce it to purchase machines of the Time Recorder Company through him (Green) or otherwise, he (Green), the agent of the company, having a commission on such sales, would pay the amount of such commissions to Beavers, and that by means of this corrupt offer, assented to by Beavers, Beavers was bribed and procured to use his influence with the government for the purchase of these machines. (2) That the payments made by Green to Beavers were in pursuance of such a corrupt agreement. Thus the mere fact of the payment of money by Green to Beavers is made to prove (1) the making and existence of a corrupt agreement, and (2) the performance of the agreement.

The most that can be claimed from the evidence adduced by the government in support of indictment No. 23,927, charging that Green bribed Beavers in relation to the International time recorders, and in violation of section 5451 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3680], is that it creates a strong presumption that there was some arrangement or agreement between Beavers and Green by which Green was to pay or transmit money to Beavers. The time of the making, the nature or character of the agreement, the subject-matter to which it related, and the consideration for such money, are left to mere conjecture and surmise. Not a scrap of writing produced, or a spoken word testified to, gives any light on, or even tends to support, the theory that there was an unlawful agreement or understanding, or that money was paid to influence the official action of Beavers. Neither suspicion, conjecture, nor surmise establishes probable cause either that a crime has been committed or that a designated person is guilty of the commission of such crime, if committed. For anything that appears in the evidence relating to indictment No. 23,927, Green may have borrowed money of Beavers, agreeing to pay him when he received his commissions from the Time Recorder Company, or he may have purchased property from Beavers, agreeing to pay him at such times. We may indulge in speculation as to the existence of other agreements and business transactions, and such imaginary agreements and transactions find as much support in this evidence, outside of the indictment itself, as does this charge of bribery. The defendant in a criminal case is presumed to be innocent until proven guilty, and this presumption obtains in favor of a defendant accused by the government of the United States to the same extent and with the same force as when the accusation is made by an individual. This presumption of innocence obtains in a proceeding of this character. The government is not under obligation to establish a case beyond a reasonable doubt, or beyond a doubt establish cause for believing that a crime has been committed and that the defendant is guilty of such offense. However, suspicion, guess, surmise, conjecture, and speculation, with some evidence as a basis, do not establish probable cause in the eye of the law. The evidence must point to crime and indicate the defendant as the probable criminal.

"Probable cause is the existence of such facts and circumstances as would excite the belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." Wheeler v. Nesbitt et al., 24 How. 544, 16 L. Ed. 765. "Probable cause, as defined in the books, is such a state of facts and circumstances as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice upon the facts within his knowledge, to believe that the person accused is guilty." Heyne v. Blair, 62 N. Y. 22. See, also, Bacon v. Towne, 4 Cush. 217; Carl v. Ayers, 53 N. Y. 14; McGurn v. Brackett, 33 Me. 331. "It is a reasonable ground for believing a person guilty; such reasons and such circumstances as would be satisfactory and convincing to right reason." Wanser v. Wyckoff, 9 Hun, 178. See, also, Anderson v. How, 116 N. Y. 336, 22 N. E. 695; Wheeler v. Nesbitt, 24 How. 544, 16 L. Ed. 765; Lacy v. Mitchell, 23 Ind. 67; Hays v. Blizzard, 30 Ind. 457; Driggs v. Burton, 44 Vt. 124; Mitchell v. Wall, 111 Mass. 492; Harpham v. Whitney, 77 Ill. 32. There is no reasonable ground for believing a person guilty of a crime when the only fact proved is just as consistent with his innocence as with his guilt. There is no probable cause to believe a crime has been committed when the only fact shown is as consistent with the nonexistence as the existence of a crime. It is true that in some of the cases it is stated that "probable cause" is a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in his belief that the person accused is guilty of the offense. Anderson v. How, 116 N. Y. 336, 22 N. E. 695. It will be seen there must be "circumstances sufficiently strong in themselves to warrant a cautious man in his belief." Suspicion (Webster) is "the act of suspecting; the imagination or apprehension of the existence of something without proof, or upon very slight evidence or upon no evidence." No one will contend that this suspicion constitutes "reasonable cause," as cause must be based on known facts, or results from which the existence of facts causing the result is certain, and these facts must point to guilt in the estimation of a reasonable mind.

It is a familiar and well-established rule in criminal cases that, where the facts shown and the inferences to be drawn therefrom are just as consistent with the innocence of the defendant as with his guilt, the court is bound to give that construction to the facts, and to draw those inferences which are favorable to the defendant. Applying that rule here, we find nothing in the evidence, outside of the indictment, that will justify the holding of this defendant. It appears from the evidence that shortly prior to the finding of these indictments two post office inspectors in the employment of the government waited upon Mr. Green at his office in the city of New York and sought from him an explanation of these payments of money alleged to have been made to Beavers. Green declined to make any statement unless the questions were in writing, and to questions put in writing he stated he would give his answer

within a day or two or soon. These inspectors then put their questions in writing. The general purport of each, with one exception, is whether or not Green at certain dates made payments of money to Beavers, and, if so, why and on what account. Another inquiry was whether or not certain officers of the government had been given or promised stock in the Bundy Manufacturing Company, the International Time Recording Company, or the Doremus Company, with each of which Green had been connected, and from each of which the government had purchased machines. Promptly and within a day or two Mr. Green communicated his reply in writing to these inspectors, in which he stated emphatically and clearly that from the time he first learned the government was seeking to investigate these transactions between himself and Beavers and other officers of the government, or between the companies represented by him (Green) and Beavers, or other officers of the government, he (Green) had been ready and willing at any and all times to afford every facility for furthering and promoting the investigation, and had been ready and willing at any and all times to throw open his bank and business accounts, produce his books and papers, and answer any and all questions relating thereto, and that he had repeatedly so offered in writing, as could be readily ascertained by consulting his letters on file with the department at Washington. Mr. Green also stated in such letter that all his transactions with the government and its officers, including Beavers, had been open and aboveboard, correct and honest. He further stated that, notwithstanding these offers on his part to throw open his accounts, books, and papers to the inspection of the government and fully explain same, the government had seen fit to conduct a secret investigation, producing by criminal process in the courts his private books, accounts, and papers in litigations or criminal proceedings to which Green was not a party, and where, of course, he had no opportunity to explain—all to his detriment as a business man and to his financial discredit and injury. This letter was introduced in evidence by the government, and its assertions are unexplained and uncontradicted.

It was within the power of the government on this examination to show the facts to be otherwise than as stated by Green, if they were and the government so desired, even after putting the letter in evidence. The government made no effort to show that the statements made by Green were incorrect in any respect. Nothing derogatory to Green, no conclusion or inference pointing to criminality on his part, can be drawn from his refusal to answer the specific questions put by these inspectors, in view of Green's letter and the statements therein contained, the substance of which has been given, and which was put in evidence by the government as stated and made a part of its case. At this time and under such circumstances Mr. Green was under no obligation to speak, or explain his transactions with Beavers. The officers of the government, from the fact that Green paid Beavers money, are seeking to draw the inference that there was an agreement by Green to pay money to Beavers to influence his

conduct as a government officer, and an actual bribing, without any proof whatever, other than such payment of money, that there ever was such an agreement or that Beavers' conduct as an officer was in any way influenced by such payment. There is not a particle of evidence in the record relating to the charge made in this indictment, outside of the indictment itself, that Beavers did anything wrong, or that his action was influenced by any consideration other than a desire to promote the best interests of the government he represented. On the other hand, the government, after showing the payment of this money in the mode and manner heretofore pointed out, assuming for our present purposes that the checks passed direct from Green to Beavers, has seen fit to put in evidence the absolute denial of Green that there was any unlawful or improper agreement, any unlawful or improper act or any criminality, whatever, and also his statement, which is not denied, that he (Green) has repeatedly offered to present books and documents and fully explain all of the transactions between himself and Beavers. It will not do for the government to assert that this letter, written by Mr. Green, was a pretense or false in any particular. Its statements are not contradicted or inherently improbable. There is not a particle of evidence to contradict or discredit any assertion made by Mr. Green in that communication. If his statements of fact are true, and I am bound in law to assume they are true, then Mr. Green was fully justified in refusing to answer the written questions put by these inspectors. In short, no inference or conclusion pointing to the guilt of Mr. Green on the charge we are now considering can, under the circumstances, be drawn from his refusal to explain to these inspectors the details of his financial transactions with Mr. Beavers. The evidence shows that Mayer, the complainant, had been in the case but a very few days, when he, with his associate, called on the defendant, Green, and asked him for an explanation of his payments of money, if any were made, to Beavers; that others had been prosecuting the inquiries and investigation prior to that time. If Mr. Green's statements in such letter handed Inspector Mayer were incorrect as to his prior offers to produce books and papers and fully explain all his transactions with Beavers and others, the government had it in its power, and it was called upon, to show the falsity of Green's statements.

We now come to consider the remaining questions in the case, which are: (1) Was this indictment, No. 23,927, in evidence before the commissioner, and is it now before this court, on the question of "probable cause"? And (2) if in evidence on that question, does it state facts (in a proper way and with sufficient distinctness) to show the commission in the District of Columbia of a crime against the United States, and that there is probable cause to believe the defendant, George E. Green, guilty thereof? If these questions are answered in the affirmative, still another must be answered, which is, did the United States, by giving evidence against Green on the examination before the commissioner, in addition to the introduction of the indictment—that is, by calling

witnesses to prove the allegations of the indictment—in legal effect waive, or even limit or impair, the probative force of such indictment? In other words, is this court, and am I as a judge, to assume ·or presume that the United States produced all the evidence upon which the indictment or charge against the defendant was and is founded, and did or does the evidence so produced contradict, impeach, weaken, or impair the probative force of the indictment? The defendant, in view of the decision of the Supreme Court of the United States in Beavers v. Henkel, 194 U. S. 73, 24 Sup. Ct. 605, 48 L. Ed. 882, is compelled to admit that this indictment is prima facie evidence of all the facts therein alleged. If such allegations of fact are sufficient to show (1) the commission of an offense in the District of Columbia against the United States and (2) probable cause to believe George E. Green guilty of the commission of such crime, then, in the absence of other evidence, it is my duty as a court to dismiss the writ of habeas corpus and remand the defendant; and it is also my duty as judge to grant the·order for the removal of such defendant to the District of Columbia for trial, provided such indictment was in evidence generally before the commissioner, or on these questions. The defendant, by his counsel, insists that the allegations of the indictment are not stronger than the evidence, documentary (aside from the indictment) combined with that given by the witnesses, presented by the government on the hearing before the commissioner in support of the charge contained in the information, of which the indictment forms a part; that, if such evidence (aside from the indictment) fails to show the commission of a crime and probable cause to believe the defendant the guilty party, it cannot be aided, reinforced, or added to by the indictment itself, even if such indictment was in evidence generally in the case before the commissioner, and, if true, sufficient to show the commission of a crime by George E. Green in the District of Columbia at the time alleged. I will dispose of this question before coming to those which in natural order precede it, viz.: Was the indictment in evidence generally and for all purposes before Commissioner Hall? and does it effectively charge the commission of a crime by the defendant in the District of Columbia?

The defendant cites Emmons v. Westfield Bank, 97 Mass. 230–243, as correctly defining "prima facie evidence," and says:

"Prima facie evidence is evidence which, standing alone and unexplained, would maintain the proposition and warrant the conclusion to support which it is introduced."

Prima facie evidence, once in a case, stands there all through the trial, and must be given its full probative force, unless stricken out, but may be overcome by evidence given in explanation or contradiction. It is never overcome by the mere silence of the party who has offered it, for he has no occasion to speak further, or by the failure to produce further supporting evidence, for that is not necessary, or by the mere weakness of additional or further evidence introduced in support of such prima facie case. If a prima facie case is made by the proof of certain facts, and other facts are

also proved which tend to support that case, but which facts, standing alone, would not make it out, the prima facie case is not weakened. Nor is a prima facie case weakened by evidence intended to support or strengthen it, but which does not, provided such evidence does not contradict or impeach the prima facie case.

In Blanshan v. Russell, 32 App. Div. 103, 52 N. Y. Supp. 963 (cited by defendant), the note put in evidence recited "for value received." This was ample proof of a good and valuable consideration, and sufficient to support the promise and maintain the action; but the plaintiff, not content with this, sought to prove and did prove the actual consideration for the note, and in so doing showed a want of legal consideration. He thereby actually disproved and overthrew his prima facie case. The court said:

"But if the plaintiff, upon the trial, proves that the note was made and delivered for a consideration that the law does not recognize as sufficient to sustain the promise, the burden which rested upon the defendant has been met by the evidence in the case quite as effectively as if it had been introduced by the defendant himself."

It is, of course, true that, when certain facts are proved from which, in law, the court may infer the existence of another fact, such inference is not permissible, when the party by credible and uncontradicted evidence proves the nonexistence of the main fact. The evidence given by the government against George E. Green on the hearing before the commissioner, aside from the indictment, was not and is not sufficient to show that a crime had been committed, or that the defendant was probably guilty of the commission of a crime; but such evidence in no way contradicts or tends to contradict or weaken the allegations of the indictment. In fact, it supports some of the important allegations therein contained. The government did not assert or concede that the evidence given before the commissioner, aside from the indictment, was the evidence, or all the evidence, produced before the grand jury of the District of Columbia when the indictment was found, and upon which the indictment was founded; and such is not the effect of the action of the government in proceeding to give evidence after the ruling made by the commissioner and which will be hereafter fully stated. Nor did the government by its action concede that the evidence (aside from the indictment) produced before the commissioner is all the evidence it will be able to produce on the trial of the defendant under the indictment, if he is removed for trial. If the indictment had been received for some special purpose, other than to show the commission of a crime and probable cause, it could not have been used legally by the commissioner for any other, and it would be a serious question whether this court on the habeas corpus proceeding, or the judge on the motions, could consider it for any other purpose.

The proceedings before the commissioner, so far as they affect this question, were as follows (and I follow the original documents and proceedings and evidence which are before me on the motion for a warrant of removal, and referred to in the return of the com-

missioner to the writ of certiorari): September 19, 1903, indictment No. 23,927 (for bribery of Beavers in connection with the Bundy time recorders), attached to and forming a part of the complaint or information, was placed before the commissioner, together with the warrant for the arrest of Green, dated September 17, 1903, issued thereon out of the Supreme Court of the District of Columbia. Commissioner Hall issued his warrant the same day, September 19, 1903, and the defendant, Green, was arrested thereon and taken before the commissioner. The original record of the commissioner, made at the time, says:

"The defendant, brought before said commissioner, entered a plea of not guilty of the charge stated in the indictment, and demanded an examination as to whether there was probable cause to believe him guilty of the offense charged. Such examination was allowed by the commissioner."

Walter S. Mayer, the complainant, was then sworn on the question of the identity of the defendant, and his evidence established the fact that the defendant, George E. Green, under arrest, was the George E. Green named in the indictment. The further hearing was, by consent of defendant, adjourned to September 22, 1903. On the day to which such hearing was adjourned the following occurred, according to the original record of the commissioner:

"Before U. S. Commissioner Chas. S. Hall, September 22, 1903. Examination resumed pursuant to adjournment of September 19th. Present: Geo. B. Curtiss, for the government, and Theo. R. Tuthill, for defendant. Defendant's attorney moves that the complaint herein be dismissed, and that the defendant be discharged, on the ground that the indictment under section 5451 of the Revised Statutes of the United States, charging bribery, does not recite and allege facts sufficient to constitute a crime. The motion was opposed by Mr. Curtiss, the U. S. attorney, objecting to the dismissal of the complaint and the discharge of the defendant on the grounds stated. Motion denied. The government thereupon offered in evidence an exemplified copy of the indictment charging defendant with bribery under section 5451, together with the bench warrant issued by the Supreme Court of the District of Columbia for the arrest of defendant: also the complaint herein made by Walter S. Mayer September 19, 1903, asking the arrest of defendant under a warrant to be issued by the commissioner. Objected to by defendant on the ground that the indictment alleges no facts constituting a crime. Objection overruled, and the indictment, warrant, and complaint received in evidence and marked, respectively, Exhibits A, B, and C."

The originals are annexed and so marked. It will be noted that all this occurred during the examination of the defendant, held pursuant to his demand, for the purpose of ascertaining whether a crime had been committed in the District of Columbia and whether there was probable cause to believe George E. Green guilty of the commission thereof. These were the questions in issue, and the only ones. Identity had been proven. The offer of the indictment could not have been to establish any facts other than these, and, when the objection was made that the "indictment alleges no facts constituting a crime," the commissioner overruled the objection and received it in evidence, and he in no way limited the purpose for which received. The indictment was offered to show the commission of a crime and probable cause, and it was admitted for that purpose. It is evident that this indictment was after this

ruling in evidence on the examination generally for any legal purpose, and that it was the duty of the commissioner to give it full probative force, and that, whatever his action may have been thereafter, the receipt of such indictment in evidence, assuming its sufficiency, made a prima facie case against the defendant. The indictment might, on motion, have been stricken out; but no such action was had or suggested. Immediately on such indictment being received in evidence, Mr. Curtiss, the United States attorney, made the following statement:

"The government claims, and asks the commissioner to hold, in this case, that the indictment of itself, with the evidence of identity already given, makes out a prima facie case, and establishes probable cause and ground to believe that the defendant is guilty of the offense as charged in the indictment, and that a finding to that effect should be made."

The record says:

"The commissioner declined to accede to this request of the government, and adhered to his ruling of September 19th that an indictment is secondary evidence only, and, when objected to, is not to be deemed conclusive; but evidence must be given aliunde to show that the crime as charged in the indictment has been committed, and that there is probable cause to believe a defendant guilty of the alleged offense."

The record fails to show that any ruling on this question was made September 19th. The further hearing was then adjourned to September 28, 1903, and on that day a further adjournment was taken until October 13, 1903, but that day by consent was changed to October 12th, on which day a further adjournment was had until November 9, 1903, and thereafter further adjournments were had until November 20, 1903. On the 12th day of October the commissioner filed a memorandum of opinion setting forth his views as to the effect of the indictment as evidence, and holding in substance that the government should give further evidence as to the commission of a crime and that there was probable cause to believe the defendant guilty. This memorandum of opinion was not a ruling upon the admissibility of the indictment, and had no effect whatever to limit or restrict the purposes for which the indictment might be used as evidence in the case. It matters not that a judge or commissioner, during an examination, where there is no jury to be influenced by the remarks of the court, expresses an opinion as to the effect of certain evidence, or the weight that should be given it in the decision of the case, which turns out to be erroneous. If objection is made to the admission of the evidence on grounds which would seem to be supported by the remarks or expressions of opinion made by the court or commissioner, and the court or commissioner, notwithstanding such expressions of opinion, overrules the objections and admits the evidence, it must be considered that the commissioner or judge, as the case may be, has either changed his views or declines to rule in accordance therewith, and in such case, if the evidence is not received upon some particular question, it may be used, and must be used at all subsequent stages of the case, if not stricken out, for what it is legally worth.

This indictment was received in evidence without restriction on

the 22d day of September, 1903, under the objection made by the defendant that such indictment alleged no facts constituting a crime, which objection was overruled by the commissioner. On that day, it is true, the commissioner declined to hold the defendant on proof of identity and the indictment itself without further evidence. The commissioner stated and held that the indictment was secondary evidence only, and that, when objected to, it was not to be deemed conclusive, but that evidence must be given aliunde to show the commission of the crime and probable case; but, notwithstanding this ruling and holding, the indictment was in evidence generally and before the commissioner for all legal purposes, and the commissioner was bound in the final decision of the case to give it full probative force, inasmuch as he had not limited the purposes for which it was received in evidence.

This examination on this charge of bribery was continued on the 20th day of November, 1903, on which day the defendant asked to dismiss the indictment in question on the grounds that it was found without jurisdiction, that the grand jury was not a legally constituted body, that the court had no jurisdiction under the facts presented either of the offense charged or of the person of the defendant, that the facts stated in the indictment do not constitute a crime, that the facts stated in the indictment do not constitute the crime alleged and charged therein, and that the indictment is void for duplicity and for repugnancy and contradiction of statement. Certain conversation was then had between the court and the United States attorney in regard to the proceedings had before that time, and also in regard to another indictment. Then Mr. Curtiss asked the counsel for the defendant: "Will it be conceded that George E. Green who is present is the George E. Green named in this indictment?" (referring to one found in October, 1903). Defendant's counsel answered: "Yes." The United States attorney then inquired: "In all of them?" (referring to all of the indictments). To which inquiry the defendant's counsel replied: "Yes." Mr. Curtiss, the United States attorney, then said in open court:

"Then we offer in evidence the indictment against George E. Green and George W. Beavers (being the indictment in question), filed on the 17th day of Sepembter, 1903—indictment No. 23,927."

This is the indictment for bribery in relation to the Bundy, or International, time recorders, and is the one we are now considering, and the same that had been offered and received in evidence on the 22d day of September, 1903, as above stated. To the receipt of this indictment in evidence at this time the defendant's counsel objected as follows:

"That there is no proof of the facts contained in it, or as to its competency or materiality upon any question other than the fact that there is an indictment in existence."

The United States attorney then said:

"We offer it in evidence for two purposes—to show the existence and finding of the indictment, and as proof of the acts of criminality as charged in the indictment; proof of the acts constituting the offense."

The objections were thereupon overruled, and the defendant's counsel took an exception. This placed the indictment in evidence a second time for all purposes for which, under the law, it was evidence, and it was the duty of the commissioner in the final decision ·of the case to give it the full probative force to which entitled; .and, it being in evidence generally, it is the duty of this court on the habeas corpus proceedings, and my duty as a judge on the motions for a warrant of removal, to give it all the probative force to which it is entitled under the rulings and decisions of the Supreme Court of the United States. It will be noted that November 20th the indictment was offered by the United States attorney "as proof of the acts of criminality as charged in the indictment; proof of the acts constituting the offense." When the objections were overruled, and the indictment was received under this offer without limitation, it was received for the purposes for which offered and became evidence on those questions. Mr. Curtiss, the United States attorney, then moved that bail be fixed on each indictment and that the defendant be held on the indictment in question. The court denied the motion, and said:

"There is no federal statute making an indictment evidence against the accused. At best it is but secondary evidence, for it presupposes better evidence behind—that produced before the grand jury. It is a transaction to which the accused is neither party nor privy, and therefore not evidence against him; and, further, it reverses every rule of evidence by assuming the accused guilty until he proves his innocence. The motion is denied."

We see that the commissioner had now received the indictment in evidence, under objection that it was not evidence of the acts of ·criminality recited therein, twice, overruling the objection that it was not evidence of the acts of criminality therein charged and re-·cited, and that he received it for the declared purpose of proving the acts of criminality, charged in the indictment. It may be, but this is matter of conjecture, that the commissioner would have dis-·charged the defendant, had the government failed to present further evidence. The government did produce further evidence, the nature of which we have already seen. The commissioner did not render his decision until the 18th day of December following. The processes of reasoning by which he arrived at the conclusion that the crime charged in the indictment had been committed in the District of Columbia and that there was probable cause to believe the defendant, Green, guilty of the commission thereof, cannot be ·determined. If there was before him sufficient legal evidence to warrant the finding, then it was justified, and must be upheld by this court and by me on the question of granting a warrant of removal. For anything that appears, the commissioner changed his mind as to the probative force and effect of the indictment; for as he had received it as evidence on the question whether the crime charged had been committed and whether there was probable cause to believe the defendant guilty, and as there was no sufficient evidence produced aliunde the indictment to warrant the holding of Green, I am bound to presume the commissioner held the defend-ant on the statements of fact contained in the indictment, aided and

supported by the other evidence presented on the examination. In short, the indictment was in evidence generally for all lawful purposes, and hence, if its allegations are sufficient of themselves, or sufficient aided by the other evidence adduced, then the decision was justified and should be upheld.

The question of the probative force of an indictment in a proceeding for the removal of a defendant for trial from the district where found to that where the indictment was found and is pending was settled in Beavers v. Henkel, 194 U. S. 73, 24 Sup. Ct. 605, 48 L. Ed. 882. The headnote is as follows:

"Statutory provisions must be interpreted in the light of all that may be done under them. In all controversies, civil and criminal, between the government and an individual, the latter is entitled to reasonable protection. The fifth amendment is satisfied by one inquiry and adjudication, and an indictment found by the proper grand jury should be accepted anywhere within the United States as at least prima facie evidence of probable cause, and sufficient basis for removal from the district where the person arrested is found to the district where the indictment was found. The place where such inquiry must be had, and the decision of the grand jury obtained, is the locality in which by the Constitution and laws the final trial must be had."

The court said, at page 82 of 194 U. S., and page 606 of 24 Sup. Ct. (48 L. Ed. 882):

"The controlling questions to be discussed on this appeal are whether the indictment offered in evidence before the commissioner can be regarded as conclusive evidence against the accused of the facts therein alleged, whether it was competent at all as evidence of such facts, and whether such indictment was entitled to be accorded any probative force whatever."

And at pages 84, 85, of 194 U. S., and page 607 of 24 Sup. Ct. (48 L. Ed. 882):

"The thought is that no one shall be subjected to the burden and expense of a trial until there has been a prior inquiry and adjudication by a responsible tribunal that there is probable cause to believe him guilty. But the Constitution does not require two such inquiries and adjudications. The government, having once satisfied the provision for an inquiry and obtained an adjudication by the proper tribunal of the existence of probable cause, ought to be able, without further litigation concerning that fact, to bring the party charged into court for trial. The existence of probable cause is not made more certain by two inquiries and two indictments. Within the spirit of the rule of giving full effect to the records and judicial proceedings of other courts, an indictment, found by the proper grand jury, should be accepted everywhere through the United States as at least prima facie evidence of the existence of probable cause. And the place where such inquiry must be had and the decision of a grand jury obtained is the locality in which by the Constitution and laws the final trial must be had."

It is not for this court, or any judge thereof, to question either the wisdom or propriety or correctness of this decision. It is the law of the land as declared by the highest court thereof. It is a holding that the statements of fact contained in an indictment are prima facie evidence of the existence of such facts and that they are correctly stated. It is also a holding that in these removal proceedings such indictment may be put in evidence against the defendant, although it is but the presentment or finding of a grand jury, based upon ex parte evidence and given in a forum where the defendant was not present or permitted to be present, and where there was no

opportunity for cross-examining the witnesses. When the government closed its case before the commissioner, having introduced the indictment in evidence and having adduced other evidence in support of the allegations contained therein, the defendant, George E. Green, had an opportunity to produce evidence in contradiction. He was not bound to do so, nor can any inference be drawn against him from his silence. The defendant had the right to rely before the commissioner, and has the right to rely here, upon the weakness of the documentary and oral evidence produced, including the indictment. It has been held by the Supreme Court of the United States that a warrant of removal should not be refused because of technical defects in the indictment. That court holds that such defects are for the consideration of the court where the indictment was found and where the trial is to be had, in case removal is ordered. It is not suggested, however, by that court, that a warrant for the removal of the defendant should be issued by the judge when the indictment fails to state a crime; that is, when the facts alleged in the indictment, giving them a fair interpretation, do not constitute the crime attempted to be charged. The indictment, or, more properly speaking, the statements of fact contained in the indictment, is prima facie evidence of the commission of the crime charged therein, and is also prima facie evidence that probable cause exists to believe the defendant guilty of the commission of such crime. Such indictment cannot be used as prima facie evidence of the commission by the defendant of some crime not mentioned in the indictment.

The indictment we are now considering, No. 23,927, is indorsed as follows:

"No. 23,927. United States vs. George E. Green. Bribery of United States Officer in Violation of section 5451, Rev. St. U. S. Witnesses: H. E. Bundy. A. Ward Ford. John T. Tierney. Charles A. Kolstad. Harry F. Burns. A. E. Van Cott. W. S. Mayer. A true bill. A. M. McMachlen, Foreman. Filed in open court September 17, 1903. J. R. Young, Clerk."

This indictment charges that on the 1st day of July, 1901, and from then until the 24th day of March, 1903, George W. Beavers, late of the city of Washington, District of Columbia, at Washington aforesaid, was an officer of the United States of America and a person acting for and on behalf of the United States in an official function, under and by authority of a department of the government; that is to say, general superintendent of salaries and allowances in the office of the First Assistant Postmaster General of the said United States in the Post Office Department of the government thereof, and that during said time he performed the duties of such superintendent. The indictment further explicitly and fully charges that by reason of his said office and its functions said Beavers was charged with the consideration of allowances for items of supplies, including furniture for use at first and second class post offices throughout the United States, involving outlays and increases of expenditure of the moneys of the United States, etc. The indictment then charges that George E. Green, of the city of Binghamton, during the time aforesaid, was the president

and agent of the International Time Recording Company, a corporation existing under the laws of the state of New York, and engaged in the business of selling time-recording devices for use in post offices, etc., and that as such president and agent of the said corporation he undertook to furnish and did furnish large numbers of such time-recording devices to the Post Office Department of the United States for use in the post offices of the United States, and that the said George E. Green at all times during said period well knew that the said George W. Beavers was such officer of the United States and a person acting in an official function as above stated. The indictment then charges that during the said period, and on the 11th day of December, 1901, the said George W. Beavers and George E. Green entered into an unlawful and corrupt agreement, whereby the said Green, as president of the said corporation, undertook and promised on its behalf to pay to the said George W. Beavers from time to time, as the corporation should receive payment therefor, for the personal use and benefit of the said Beavers, and while he continued to be such officer and person acting in the official function as aforesaid, 10 per cent. of all sums paid the corporation by the United States out of the moneys appropriated by the department to said corporation for purchasing its time recording devices for the use of the Post Office Department. The indictment then charges that the defendant, George E. Green, afterwards, and on the 11th day of December, and while said Beavers was still an officer of the United States, and acting for and in its behalf and in the official function in pursuance of the said unlawful and corrupt agreement, at Washington in the District of Columbia—

"Did tender to the said George W. Beavers a certain obligation for the payment of money, to wit, the personal check of him, the said George E. Green, drawn upon the Knickerbocker Trust Company of New York City, N. Y., in favor of the said George W. Beavers, for the sum of three hundred and twenty-five dollars, with intent on the part of him, the said George E. Green, to influence his, the said George W. Beavers', decision and action to the detriment of the said United States on a matter then pending and thereafter to be brought before him in his said official capacity; that is to say, to influence him, the said George W. Beavers, in the matter of his making allowances for and procuring for the said Post Office Department time recording devices of the kind aforesaid, in such manner and to such extent that he would, as he thereafter, from time to time during the said period, did, in consequence of such tender, procure and purchase, in the manner aforesaid, for the said Post Office Department and for the use aforesaid, from the corporation aforesaid, large numbers of such time-recording devices at prices greatly, to wit, by ten per centum, in excess of the prices at which he could, as he, the said George W. Beavers, then well knew, have obtained the same from the said corporation, if he had not entered into or executed the said unlawful and corrupt agreement with the said George E. Green, and if he had procured and purchased the same by honest methods, and in the manner in which such articles are usually bought and sold between individuals (the public exigency then requiring the same to be procured and purchased without any advertising for proposals for furnishing the same), and with intent also on the part of him, the said George E. Green, then and there to influence him, the said George W. Beavers, to commit, and aid in committing, and collude in, and allow, the fraud upon the said United States involved in the said unlawful and corrupt agreement, and also with intent to induce him to omit to do an act in violation of his lawful duty as such officer and person acting

as aforesaid; that is to say, to omit to inform his said superior officers truly and in good faith concerning all matters pertaining to the purchase of such time recording devices from the said corporation, and especially concerning the existence of the said unlawful and corrupt agreement—against the peace and dignity of the said United States, and contrary to the form of the statute of the same in such case made and provided."

Count 2 charges that on the 13th day of January, 1902, at Washington aforesaid, said Green, under the same agreement and with the same intents before mentioned, tendered and gave to the said George W. Beavers—

"A certain other obligation, to wit, another personal check of him, the said George E. Green, drawn upon the Seventh National Bank of New York City, N. Y., for the sum of $331.18 in money, payable to him, the said George W. Beavers."

Counts 3 and 4 are the same, except they charge the tendering by Green to Beavers at other dates of other checks, which checks are described in the same language, except as to the amount.

These counts (2, 3 and 4) fail to charge the commission of a crime. Each alleges that Green tendered at a certain date to said Beavers, with the several intents hereinbefore specified, "a certain other obligation." The statute requires that the obligation tendered be one for the payment of money, or one for the delivery or conveyance of something of value. An obligation is not necessarily one that provides either for the payment of money or for the delivery or conveyance of something of value, and hence these counts of the indictment are insufficient to charge a crime. Neither of these counts is aided by the allegation following: "To wit, another personal check of him, the said George E. Green," etc. The check is not set out in full, nor is its legal effect even stated. Such checks are not alleged to have been obligations for the payment of money, or obligations for the delivery or conveyance of something of value.

Under section 5451 of the Revised Statutes [U. S. Comp. St. 1901, p. 3680] it is a crime to tender a contract for the payment of money, and it is a crime to tender an undertaking for the payment of money, and it is a crime to tender an obligation for the payment of money, and it is a crime to tender a gratuity for the payment of money, and it is also a crime to tender a security for the payment of money. The Congress in that section has used the words "contract," "undertaking," "obligation," "gratuity," and "security." These words have different meanings in the law. The tendering of a contract for the payment of money, or the tendering of an undertaking for the payment of money, are different offenses from the tendering of an obligation for the payment of money. It is a crime to do either of these acts. The check mentioned in count 1 of the indictment in question is not set out. It is described as—

"The personal check of him, the said George E. Green, drawn upon the Knickerbocker Trust Company of New York City, New York, in favor of the said George W. Beavers, for the sum of three hundred and twenty-five dollars."

Its date is not given, nor is its language. For anything that appears, this check may have had conditions and limitations and re-

strictions. It may have contained other agreements. Having described the crime committed as the tendering of an obligation for the payment of money, this count of the indictment could not be supported by proof that Green tendered a contract for the payment of money, or an undertaking for the payment of money, or a security for the payment of money. The offenses are different. Each of these offenses may be sustained by different proof, and by proof of the tender of a different instrument.

In U. S. v. Cruikshank et al., 92 U. S. 542, 557, 558, 23 L. Ed. 588, it was held:

"In criminal cases, prosecuted under the laws of the United States, the accused has the constitutional right 'to be informed of the nature and cause of the accusation.' Amend. 6. In United States v. Mills, 7 Pet. 142 [8 L. Ed. 636], this was construed to mean that the indictment must set forth the offense 'with clearness and all necessary certainty, to apprise the accused of the crime with which he stands charged'; and in United States v. Cook, 17 Wall. 174 [21 L. Ed. 538], that 'every ingredient of which the offense is composed must be accurately and clearly alleged.' It is an elementary principle of criminal pleading that where the definition of an offense, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species—it must descend to particulars.' 1 Arch. Cr. Pr. & Pl. 291. The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances."

In United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516, the court held:

"In an indictment for committing an offense against a statute, the offense may be described in the general language of the act; but the description must be accompanied by a statement of all the particulars essential to constitute the offense or crime, and to acquaint the accused with what he must meet on trial. A count in an indictment under Rev. St. § 5480 [U. S. Comp. St. 1901, p. 3697], which charges that the defendant, 'having devised a scheme to defraud divers other persons to the jurors unknown, which scheme he * * * intended to effect by inciting such other persons to open communication with him * * * by means of the post office establishment of the United States, and did unlawfully, in attempting to execute said scheme, receive from the post office * * * a certain letter' (setting it forth), 'addressed and directed' (setting it forth), 'against the peace,' etc., does not sufficiently describe an offense within that section, because it does not state the particulars of the alleged scheme to defraud; such particulars being matters of substance, and not of form, and their omission not being cured by a verdict of guilty."

In Hughes' Federal Procedure, p. 38, it is said:

"In statutory offenses the language of the statute may be followed, but this does not dispense with the necessity of setting out the specific elements of the offense itself with sufficient definiteness to put the prisoner on his defense and to enable him to protect himself from a second prosecution"— citing U. S. v. Fero (D. C.) 18 Fed. 901; U. S. v. Brazeau (C. C.) 78 Fed. 464; Peters v. U. S., 94 Fed. 127, 36 C. C. A. 105; Cochran v. U. S., 157 U. S. 286, 15 Sup. Ct. 628, 39 L. Ed. 704.

136 F.—41

As the date and contents of the check alleged to have been an obligation for the payment of money are not set out in this indictment, should the defendant be tried and acquitted, the government might obtain another indictment in the District of Columbia for having tendered the same check precisely, alleging generally a check of this description, without giving its date, and charging the defendant, Green, with having tendered an undertaking for the payment of money, or possibly a contract for the payment of money. The record would not show a prior indictment for and acquittal of the same offense.

In Hughes' Federal Procedure, at page 39, it is said:

"An indictment must set out a written document in hæc verba, though, as to certain matter made unmailable by the federal statutes, an allegation in the indictment that it is improper to be put upon the records of the court renders it discretionary with the court whether to require such matter to be set out in the indictment, and the exercise of such discretion is not reviewable; nor does a failure to require it to be set out infringe the prisoner's constitutional right to be informed of the nature and cause of the accusation."

If the instrument be lost or destroyed, this, however, may be alleged as an excuse for not setting out the instrument in hæc verba.

In U. S. v. Noelke (C. C.) 1 Fed. 426, it was held that the circular alleged to have been mailed in violation of the statute should be set forth in hæc verba, and that the omission so to do was not cured by a verdict.

In U. S. v. Watson and others (D. C.) 17 Fed. 145, it was held:

"By all rules of pleading, criminal as well as civil, when a written document is relied on to sustain the prosecution or plaintiff's case, it must be set out either verbatim or in substance, and not a statement of the opinion of the pleader as to the effect it was intended to or might produce; and a criminal information that does not give the substance of a document relied on, but only its effect, is not sufficient."

In Rosencrans v. U. S., 165 U. S. 257, 17 Sup. Ct. 302, 41 L. Ed. 708, it was held:

"The indictment of a person employed in the postal service for secreting, embezzling, or destroying a check or draft in a letter delivered to him as such agent need not give a full description of the check or draft; 'but it is sufficient to say that, the instrument having been destroyed, the grand jury is unable to give any further description than is found in the indictment."

The court in its opinion said:

"The gravamen of the charge is the destruction of the letter. It is an offense against the postal laws of the United States, and while the letter must contain a draft, check, or some other thing of value, or supposed value, in order to bring the case within the compass of this statute, yet it is unnecessary to describe this draft, check, etc., with the same precision as if forgery or some other crime directed against the instrument itself was charged. A full description of the check or draft being unessential, it is clearly sufficient when the grand jury say that, the instrument having been destroyed, they are unable to give any further description than such as is found in this indictment; for that, as will be seen, contains some matters of description and identification."

In the indictment now under consideration the charge is that Green tendered to Beavers an "obligation for the payment of

money." This allegation thus far uses the words of the statute. But such allegation is clearly insufficient.

In Batchelor v. U. S., 156 U. S. 426–429, 15 Sup. Ct. 446, 447, 39 L. Ed. 478, it was held:

"By the settled rules of criminal pleading, and by the previous decisions of this court, the words 'willfully misapplies,' having no settled technical meaning (such as the word 'embezzle' has in the statutes, or the words 'steal, take, and carry away' have at common law), do not, of themselves, fully and clearly set forth every element necessary to constitute the offense intended to be punished; but they must be supplemented by further averments, showing how the misapplication was made, and that it was an unlawful one. Without such averments there is no sufficient description of the exact offense with which the defendant is charged, so as to enable him to defend himself against it, or to plead an acquittal or conviction in bar of a future prosecution for the same cause. United States v. Britton, 107 U. S. 655, 661, 669, 2 Sup. Ct. 512, 27 L. Ed. 520; United States v. Northway, 120 U. S. 327, 332, 334, 7 Sup. Ct. 580, 30 L. Ed. 664; Evans v. United States, 153 U. S. 584, 587, 588, 14 Sup. Ct. 934, 38 L. Ed. 830."

In Evans v. U. S., 153 U. S. 584–587, 14 Sup. Ct. 934, 38 L. Ed. 830, the court said:

"A rule of criminal pleading, which at one time obtained in some of the circuits, and perhaps received a qualified sanction from this court in United States v. Mills, 7 Pet. 138, 8 L. Ed. 636, that an indictment for a statutory misdemeanor is sufficient, if the offense be charged in the words of the statute, must, under more recent decisions, be limited to cases where the words of the statute themselves, as was said by this court in United States v. Carll, 105 U. S. 611, 612, 26 L. Ed. 1135, 'fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.' The crime must be charged with precision and certainty, and every ingredient of which it is composed must be accurately and clearly alleged. United States v. Cook, 17 Wall. 168, 174, 21 L. Ed. 538; United States v. Cruikshank, 92 U. S. 542, 558, 23 L. Ed. 588. 'The fact that the statute in question, read in the light of the common law and of other statutes on the like matter, enables the court to infer the intent of the Legislature, does not dispense with the necessity of alleging in the indictment all the facts necessary to bring the case within that intent.' United States v. Carll, 105 U. S. 611, 26 L. Ed. 1135."

In Cochran and another v. U. S., 157 U. S. 286–290, 15 Sup. Ct. 628, 630, 39 L. Ed. 704, the court said:

"But the true test is, not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."

In view of the authorities it is perfectly evident that an indictment must be so clear and precise in its allegations and description of the crime charged that the defendant may not only know what he is called upon to meet on the trial, but be able to show by the record itself—that is, the indictment and judgment of acquittal or conviction, in case another indictment is found against him—that his prior acquittal or conviction is a bar to his prosecution under a second indictment.

Clearly this indictment, to be valid, must allege the tendering of a written instrument. Such written instrument must be an obligation for the payment of money. The indictment says that an ob-

ligation for the payment of money was tendered, and it further says that this obligation for the payment of money consisted of the personal check of George E. Green, drawn on the Knickerbocker Trust Company in favor of George W. Beavers for a certain sum of money. The date of this check is not given, nor does the indictment give or purport to give the substance of the language used in the check. Here the gravamen of the charge is the tendering of the check, and this general description, without giving the date of the instrument or the substance of the language contained therein, is clearly insufficient to protect the defendant in case of a subsequent indictment for the same offense, or to show that the check was in fact an obligation for the payment of money.

In U. S. v. Simmons, 96 U. S. 360, 24 L. Ed. 819, the court held :

"An indictment under section 3266 of the Revised Statutes [U. S. Comp. St. 1901, p. 2119], charging the defendant with causing or procuring some other person to use a still, boiler, or other vessel, for the purpose of distilling, within the intent and meaning of the internal revenue laws of the United States, is bad, unless it states the name of such other person, or avers that the same is unknown. An averment that such use was 'in a certain building and on certain premises where vinegar was manufactured and produced' is not sufficient, as it does not state that vinegar was manufactured or produced there at the time the still and other vessels were used for the purpose of distilling."

It will be further noted that this indictment fails to state, even by fair inference, that this alleged check was drawn either upon a bank or persons doing a banking business. It is not stated that the Knickerbocker Trust Company was either a corporation or an organized company. In short, the existence of the drawee of the check referred to is not alleged. If we were at liberty to presume in a criminal indictment that this "company" on which the check is stated to have been drawn had existence, still it is not alleged either that it was authorized to do or was doing a banking business. It is not alleged that Green had money on deposit or credit with such company. An order to pay money, in the form of a check, is not a check in the legal meaning of the word, unless drawn on a bank or bankers. See cases, etc., hereinafter cited. Is it to be presumed that this is the only check of this general description given at any time by Green payable to George W. Beavers? Is Green to be prepared on the trial to show the facts and circumstances attending the making of every check of this general description drawn by him? Is he not entitled to such a description of the alleged check by date and contents as will enable him to say whether or not he ever drew or had in his possession such a paper? Neither the loss nor destruction of the writing alleged to be a check is alleged, and, as it was drawn on a trust company (if that company has existence and it was paid), the presumption is it is in its possession and obtainable. In any event no reason for not giving a more detailed description is stated. Full descriptions of written instruments have not been required when the grand jury has said the further description or contents was to it unknown. See Rosencrans v. U. S., 165 U. S. 257, 17 Sup. Ct. 302, 41 L. Ed. 708.

Coming, then, to the question, was this check (assuming that it was a check drawn on a bank or banker, and that it contained a

date, and directed the payment by such bank of the sum of money specified, and was signed by Green, and that it contained no other words either enlarging or restricting its meaning or legal effect) an obligation for the payment of money? it is worthy of note that, as it was the check of Green, made payable to Beavers, and tendered for an illegal and corrupt purpose, and was not delivered to the payee and indorsed and presented to and accepted by the bank, same was not property, or a thing of value, or enforceable by Beavers or any one. Green could have stopped payment at any time. It was not accepted by the trust company and hence was not enforceable against it. See United States v. Driggs (C. C.) 125 Fed. 520; Merchants' Bank v. State Bank, 10 Wall. 604, 19 L. Ed. 1008; Bull v. Bank of Kasson, 123 U. S. 111, 8 Sup. Ct. 62, 31 L. Ed. 97; Florence Mining Co. v. Brown, 124 U. S. 385, 8 Sup. Ct. 531, 31 L. Ed. 424; Fourth Street Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855. See, also, Negotiable Instrument Law N. Y. (Laws 1897, p. 756, c. 612) § 325. Nor did it constitute an equitable assignment of the fund on which drawn, if there was a fund. See same authorities.

A "check" is defined to be:

"A writen order or request, addressed to a bank or persons carrying on the banking business, and drawn upon them by a party having money in their hands, requesting them to pay on presentment, to a person therein named or to bearer, a named sum of money." 1 Bouv. Law Dict. 225.

Also:

"A written order or request, addressed to a bank or banker, directing the drawee to pay a specified sum, either to the bearer, or to the payee named, or his order." 1 Abb. Law Dict. 214.

Also:

"A check is a draft or order upon a bank or banking house, purporting to be drawn upon a deposit of funds, for the payment at all events of a certain sum of money to a certain person therein named, or to him, or his order, or to bearer, and payable instantly on demand." 2 Daniel on Negotiable Instruments (4th Ed.) § 1566; 5 Am. & Eng. Enc. of Law (2d Ed.) 1029.

The giving of a check is a representation by the drawer that he has money on deposit with the drawee subject to his order. The law implies a consideration for the check, and also implies a promise on the part of the drawer to pay the amount of the check in case it is not paid or accepted by the bank or banker on which drawn. The giving of the check is a written admission by the drawer that he owes the amount of money specified therein to the payee, and the order or check is a mode of paying an admitted indebtedness due by directing a bank or banker who has the debtor's funds to apply such funds in satisfaction of the debt. The giving of the check is not the creation of an obligation, but the admission of the existence of an obligation to pay a certain sum of money. It creates no additional obligation or liability on the part of the drawer, but it furnishes written evidence of the debt and directs payment by another. If payable to bearer, or to the order of the payee, it is negotiable, and passes by delivery or indorsement, as the case may be. The check imposes no obligation upon the drawee to pay the same, at

least as between the drawee and payee. If the bank refuses to pay the check, having funds with which to pay the same, the payee cannot maintain an action either at law or in equity against such bank, unless the bank has accepted the check. Acceptance by the bank, in the absence of fraud, is equivalent to payment, and such acceptance discharges the drawer, the principal debtor, and the bank on which drawn then becomes the principal debtor. The legal consequence of giving a check upon a bank or banker is to furnish written evidence of the obligation of the drawer to pay the sum of money therein specified to the payee or indorsee thereof, if payable to order and properly indorsed, or to the bearer, if payable to bearer, in case the bank or banker on which drawn refuses to pay same on demand. The payee of a check, including the bearer, when made payable to bearer and delivered, accepts the same in payment (the law presumes) of a debt, and when such check is either accepted or paid, which is the same thing, by the drawee, the liability of the drawer is discharged. If not accepted or paid, the debt remains, and the holder of the check has the written admission of the drawer that he owes so much money and that it is due. A check does not contain a promise to pay in case the drawee fails to honor it. The payee of the check on its delivery becomes the acknowledged creditor of the drawer, and if such check is payable to bearer, or to his order, and the check is properly indorsed, the holder then becomes the creditor of the drawer. The giving of a check does not operate as an assignment pro tanto of the funds in bank belonging to the drawer of the check. If the holder of the check unreasonably delays to present the same for payment, and the bank or banker on which same is drawn fails, the drawer is discharged. These principles are well recognized: A check is neither a draft nor a bill of exchange, although it has many of the features of a bill of exchange and some of the features of a draft. Bull v. Bank of Kasson, 123 U. S. 110, 111, 8 Sup. Ct. 62, 31 L. Ed. 97; M. Bank v. State Bank, 10 Wall. 604, 19 L. Ed. 1008. It is not a bond or a promissory note. It is not a contract, for it contains no promise by the drawer to any person. The law implies, however, from the giving, both the representation and the promise above specified.

Is a check such as is described in this indictment an obligation or an undertaking for the payment of money, within the meaning of section 5451 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3680]? April 30, 1790, Congress passed an act to punish the bribery of a judge (Act April 30, 1790, c. 9, 1 Stat. 117), and used this language (see section 5449, Rev. St. U. S. [U. S Comp. St. 1901, p. 3679]):

"Every person who directly or indirectly gives any sum of money or of a bribe, present or reward or any promise, contract, obligation or security or the payment or delivery of any money, present or reward, or any other ing of value, to obtain * * *, shall be fined. * * *"

February 26, 1853, what is now embodied in section 5450 , the Revised Statutes [U. S. Comp. St. 1901, p. 3680], was en ed to punish bribery of members of Congress, and in March, 1f what is now embodied in section 5451 of the Revised Statutes was en-

acted to punish the bribery of any United States officers.' In each of these sections we find mention of contract, undertaking, obligation, and security for the payment of money. These were common-law terms and expressions. It has been held, and is undoubtedly the law, that, where common-law phrases are used in an indictment or information, such phrases must have the common-law interpretation. Chapman v. People, 39 Mich. 357–359; In re Richter (D. C.) 100 Fed. 295–297. See, also, U. S. v. Royall, 3 Cranch, C. C. 618, Fed. Cas. No. 16,201.

"Obligation" is defined as follows:

"The term 'obligation' also signifies an instrument or writing by which the contract is witnessed. And in another sense an obligation is said to be a bond containing a penalty, with a condition annexed for the payment of money, performance of covenants, or the like. It differs from a bill, which is generally without a penalty or condition, though it may be obligatory."

"In its general and most extensive sense 'obligation' is synonymous with 'duty.' In a more technical meaning it is a tie which binds us to pay or do something agreeably to the laws and customs of the country in which the obligation is made." 2 Bouvier's Law Dictionary, 254.

Bouvier also says that:

"A single obligation is one without any penalty, as where I simply promise to pay you one hundred dollars."

Also:

"A several obligation is one by which one individual, or, if there be more, several individuals, bind themselves separately to perform the engagement."

Also:

"A joint obligation is one by which several obligors promise to the obligee to perform the obligation."

Wharton's Law Dictionary defines an obligation thus:

"An act which binds a person to some performance; also a bond containing a penalty with a condition annexed for paying of money at a certain time, or for the performance of a covenant," etc.

Abbott's Law Dictionary, vol. 2, p. 193, defines an obligation thus:

"In a general sense a binding; a legal recognition of a person's engagement or undertaking; an enforceable duty assumed or imposed. In a stricter sense, and much more common in practical jurisprudence, a sealed instrument containing an engagement or promise. It includes bonds and other writings similarly enforceable, but not having the form and all the characteristic incidents of bonds."

In Strong v. Wheaton, 38 Barb. 616, it was held that in a statute the word "obligation" should not be given its popular signification, but its legal meaning, viz.:

"Obligation means a bond or other writing in the nature of a bond, such as statutes merchant and staple, recognizances, etc."

In Crandall v. Bryan, 15 How. Prac. 48, it was said:

"Obligation is sometimes used as equivalent to legal liability or legal duty."

In Rippon's Ex'rs v. Townsend's Ex'rs, 1 Bay, 445, it was held:

"The words 'bonds or other obligations,' in a statute, do not include promissory notes."

In Basehore et al. v. Rhodes et al., 85 Pa. 44, held, a protested draft is not an "obligation," within the meaning of the proviso.in a statute declaring that the assignees of an insolvent bank "shall receive in payment of debts due to said bank its own notes and obligations and the checks of its depositors at par." If a draft drawn and issued by a bank in due course of business, duly presented and dishonored, is not an obligation, it is difficult to see why "a check" should be held to be an obligation, especially in a criminal statute. Again, "a draft" and "a bill of exchange" are the same thing. Hinnemann v. Rosenback, 39 N. Y. 100, 101. Hence, within this decision, if a check is the same as a draft, it is not an obligation for the payment of money.

In Elsasser v. Haines, 52 N. J. Law, 10, 18 Atl. 1095, the action was upon a recognizance entered into in open court by which Haines bound himself that if Owen did not pay a certain debt, amount specified, within a certain specified time, he (Haines) would. The question was whether the statute of limitations applied to this recognizance. That statute provides:

"That every action of debt, or covenant for rent founded upon a lease under seal, whether indented or poll, and every action of debt upon any single or penal bill for the payment of money, or upon any obligation with condition for the payment of money only, * * * shall be commenced and sued within sixteen years," etc.

The court held that this recognizance was not "an obligation with condition for the payment of money only," within this statute. It only provided for the payment of money, and the point was that a recognizance is not an obligation.

In Sinton v. Carter County (C. C.) 23 Fed. 535, 537, 538, the county had issued coupon bonds, which were unpaid. An act was passed authorizing the county court of the county to execute to the holders of the outstanding bonds and coupons "new obligations" in place of the old ones. The act provided that:

"Said obligations shall contain such stipulations as to interest as may be agreed upon by the court and the holders of said bonds."

It was held that coupon bonds were within the authority granted. In other words, it was held that bonds under seal, duly executed and having coupons for interest attached, each promising to pay a certain sum of money, were obligations. Clearly they were obligations for the payment of money.

In Munzinger v. United Press et al., 52 App. Div. 338–340, 65 N. Y. Supp. 194, the claim was that a claim for services and rentals was an obligation, within the meaning of section 48 of the stock corporation law of the state of New York. Laws 1892, p. 1838, c. 688. That section provides that no corporation which shall have refused to pay any of its notes or other obligations when due in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors, or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash. The United Press had entered into certain contracts

by which it had leased certain wires, and hired from the telegraph company certain services, for which it had agreed to pay certain rentals, to be paid in monthly installments, and the rate to be paid for such services was fixed in the agreement. Bills for these rentals and services had been presented. The court held that these debts for rentals and services were not an obligation, within the meaning of this statute, and said:

"The word 'obligation' originally meant a bond containing a penalty, with a condition for the payment of money or to do or suffer some act or thing. Co. Litt. 172a. The meaning of the word, however, has gradually been enlarged by the courts, and it has ceased to be restricted to a bond or writing obligatory, and has been extended to mean a paper by which some fixed duty is assumed to be performed at a certain time, or an instrument in writing whereby one party contracts with another for the payment of money at a fixed date or for the delivery of specific articles. But, however various have been the definitions given to the word, the one essential element has always been that it must be a written paper, the duty assumed by which must be a fixed duty."

In Regina v. White, 9 Carrington & Payne, 282, the defendant was indicted for forging and uttering "a certain forged request for the delivery of goods." The order or request read as follows:

"Mr. Turner: Please to let the lad have a hat about 9s., and I will answer for the money.                                                                Ed. Barrett."

It was contended on the part of the defendant that this was not a request for the delivery of goods, but an undertaking for the payment of money, under section 3 of the statute. St. 1 Wm. IV, c. 66. The court held that it was none the less a request for the delivery of goods because it might be also an undertaking for the payment of money. This case is important in connection with Regina v. Reed, 8 Carrington & Payne, 623, where it was held that an instrument dated and containing these words:

"I promise to pay to Mr. William Bellerby, or order, the sum of one hundred pounds, or such other sum of money, not exceeding the same, as he may incur, or be put unto, for or by reason or means of his becoming one of the sureties to Mark Millbank, Esq., sheriff-elect for the county of York for the year ensuing for John Reed of this city, sheriff's officer.
     "[Signed]                                                                Val. Wilson."

—was an undertaking for the payment of money under St. 1 Wm. IV, c. 66, § 3. From these cases we may draw the distinction between an undertaking for the payment of money and an obligation for the payment of money.

Bishop on Statutory Crimes (2d Ed.) p. 299, § 328, says:

"A check in common form on bankers is an order, and so is a bill of exchange; and, if the check is postdated, this makes no difference."

Mr. Bishop also says (page 298, § 327):

"An order is in its principal elements the same, whether it is for the payment of money or for the delivery of goods."

It may be that a promissory note, a bank note, or bill of exchange is an undertaking for the payment of money. See Bishop on Statutory Crimes, § 339. But of this there is doubt. However, if a promissory note or a bill of exchange is an undertaking for the

payment of money, they are not obligations for the payment of money; nor is a check either a promissory note, a bank note, or bill of exchange, as we have already seen. Merchants' Bank v. State Bank, 10 Wall. 604, 19 L. Ed. 1008; Bull v. Bank of Kasson, 123 U. S. 110, 111, 8 Sup. Ct. 62, 31 L. Ed. 97. See, also, People v. Howell, 4 Johns. 296–301.

In Merchants' Bank v. State Bank, 10 Wall., at page 604, 19 L. Ed. 1008, the Supreme Court said:

"Bank checks are not inland bills of exchange, but have many of the properties of such commercial paper; and many of the rules of the law merchant are alike applicable to both."

The court then points out the similarities and differences, and then accepts the doctrine above stated as the law.

The same author, Bishop, in 2 Bishop's New Criminal Law, p. 323, § 566, says:

"Obligation, Bill Obligatory.—These words require a sealed instrument. At least they do under the before-mentioned St. 5 Eliz. c. 14. Coke says 'obligation' is a word of a large extent, but it is commonly taken in the common law for a bond containing a penalty with condition."

St. 5 Eliz. c. 14, reads:

"If in like manner, any one shall forge or assent to the forging of any false charter, deed, or writing, to the intent * * *; or shall, as is aforesaid, forge any obligation or bill obligatory," etc.

In Wharton's Criminal Pleading and Practice (8th Ed.) § 198, p. 141, the word "obligation" is thus defined:

"Obligation.—Under statutes based, as those of Louisiana, on the Roman law, an obligation is a unilateral engagement by which one party engages himself to another to do a particular thing. The English common-law authorities sometimes speak as if the term is limited to bonds with penalties. But, when the term is used in a statute as nomen generalissimum, it must be construed in its most liberal sense."

In all the definitions of a check found in the books it is not declared to be an engagement by which one party engages himself to another to do a particular thing. The law, however, implies certain obligations from the giving of a check in order to make such writings effective.

In People v. Howell, 4 Johns., at page 301, Kent, C. J., said:

"A check is not, either in common parlance or in the technical language of the books, called a bill of exchange or promissory note, though it may in some respects have the same legal operation. The statute, in discriminating between bills and notes and orders for the payment of money, must be interpreted according to the usual and settled understanding of those terms, and a check will, therefore, fall within the description of an order for the payment of money. * * * Penal statutes ought to be read according to the ordinary import of language, and, if a term would equally admit of two constructions, the one attended with the milder consequences ought to be adopted."

"It is a well-settled rule of construction that language used in a statute, which has a settled and well-known meaning sanctioned by judicial decision, is presumed to be used in that sense by the legislative body." Kepner v. United States, 195 U. S. 100–124, 24 Sup. Ct. 797, 49 L. Ed. ——; The Abbotsford, 98 U. S. 440, 25 L. Ed. 168.

Applying that rule here, and we must assume that Congress in using the expressions "contract," "undertaking," "obligation," etc.,

"for the payment of money," used them in their legal sense, as determined by judicial decisions. Given that meaning, this indictment fails to charge George E. Green with the doing of acts constituting a crime.

Again, "bribery," or the attempt, was an offense at common law. 1 Bishop, New Crim. Law, p. 288, § 468, subd. 3. It was "the voluntary giving or receiving of anything of value in corrupt payment for an official act done or to be done." 2 Bishop, New Crim. Law, § 85, p. 51. At common law the offering or tendering of anything of value for such purpose was an attempt to commit the crime. Id. § 88. The check tendered by Green to Beavers, having been drawn and tendered for an illegal and corrupt purpose, was void, worthless. United States v. Driggs (C. C.) 125 Fed. 520. It is true that the statute under which this indictment against Green is drawn does not specifically say that the tender must be of a valid, collectible, or enforceable contract, undertaking, or obligation for the payment of money; but can an instrument be either of those required by the statute if void and nonenforceable, and known to be such by the person tendering and the officer to whom tendered?

Again, is it not the plain meaning and intendment of the statute that the instrument tendered must be a thing of value; that is, a valid instrument? Section 5431 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3671] reads as follows:

"Sec. 5431. Every person who, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or brings into the United States with intent to pass, publish, utter, or sell, or keeps in possession or conceals with like intent any falsely made, forged, counterfeited, or altered obligation, or other security of the United States, shall be punished by a fine of not more than five thousand dollars, and by imprisonment at hard labor not more than fifteen years."

It is not stated therein that the person who passes, utters, publishes, or sells, etc., such instrument or instruments so forged, etc., with intent to defraud, must have known it to have been false, forged, counterfeited, and altered. At common law such knowledge was necessary to make out the crime intended to be covered by or embraced within such statute. Section 5431, supra. In United States v. Carll, 105 U. S. 611, 26 L. Ed. 1135, the Supreme Court of the United States, opinion per Gray, J., unanimously held that such knowledge must be averred in the indictment and proved. The indictment was held bad, even after verdict, because it did not allege that defendant knew the obligation passed and uttered by him, with intent to defraud, to be false, forged, counterfeited, and altered. The court said:

"The language of the statute on which this indictment is founded includes the case of every person who, with intent to defraud, utters any forged obligation of the United States. But the offense at which it is aimed is similar to the common-law offense of uttering a forged or counterfeit bill. In this case, as in that, knowledge that the instrument is forged and counterfeited is essential to make out the crime; and an uttering, with intent to defraud, of an instrument in fact counterfeit, but supposed by the defendant to be genuine, though within the words of the statute, would not be within its meaning and object."

I have no doubt that Congress, the legislative body, in enacting section 5451 of the Revised Statutes [U. S. Comp. St. 1901, p. 3680], intended to punish by statute what was punishable by common law, but which law could not be invoked against officers of the United States, because we have no common-law offenses against the United States. United States v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591. I do not doubt that the contract, undertaking, obligation, etc., for the payment of money, tendered must be a valid, enforceable instrument. This indictment shows on its face that the check tendered by Green to Beavers was worthless, not enforceable, not a thing of value. Hence, within the meaning of the section and the intent of the Congress of the United States, the check was neither a contract, undertaking, obligation, gratuity, nor security for the payment of money. This indictment cannot be sustained on the theory that it alleges a promise by Green to Beavers to pay him money to influence his official action in the respects stated. The indictment plainly and sufficiently alleges such a promise, but the statute requires that such promise shall be made with the intent stated in the section above quoted, and the promise alleged in the indictment is not stated to have been made with any intent whatever. Where intent is of the essence of the offense attempted to be charged, it must be set out in the indictment. If not set out, the indictment is not good. United States v. Cruikshank, 92 U. S. 542, 23 L. Ed. 588.

These defects are not technical, but go to the very life of the indictment. An offense or crime is not defectively stated. No crime or offense whatever is stated. Neither the evidence given before the commissioner on this charge, nor this indictment, nor both together, state facts showing the commission of a crime within the District of Columbia, or facts showing or tending to establish probable cause to believe that the defendant, George E. Green, has committed the crime charged, or any crime, in that District. His detention and holding by the marshal on the charge and commitment based on indictment No. 23,927 is illegal and unauthorized. The writ is sustained, and the defendant is discharged. The application for a warrant removing said Green to the District of Columbia for trial under such indictment is denied.

We will now consider indictment No. 23,940, which charges the defendant, George E. Green, with having offended against section 5440 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3676], hereinbefore quoted, by conspiring with George W. Beavers, superintendent of the salary and allowance division of the Post Office Department of the United States, having the powers and duties hereinbefore mentioned, and other unknown persons, to defraud the United States in connection with the purchase by the United States from the International Time Recorder Company, through said Green, its president and agent, of so-called Bundy time recorders or time clocks. This indictment was filed October 1, 1903, and contains 11 counts. Each count, after the first, charges that Green and Beavers, at a date named (a different date being

stated in each count), "did conspire, combine, confederate, and agree together, and with divers other persons to the grand jurors aforesaid unknown, knowingly to defraud the said United States in the manner and by the means in the said first count mentioned and described." Then follows a statement of the overt act, which consists, in count 2, of the indorsement by Green of a check drawn by the International Time Recorder Company on the Central National Bank of New York City for a sum named and payable to the order of said Green; in count 3, of the giving of the personal check of Green to Beavers for a sum and on a bank named; and of similar acts in each of the other counts. If count 1 is not good— that is, if it does not state facts sufficient to show the commission of a crime by some one, and to charge George E. Green with the commission thereof—then the whole indictment is bad; for the vice and insufficiency, if insufficient, does not lie in charging the overt act, but in the statements found in count 1, preceding the statement of the overt act, and only referred to in the subsequent counts.

It is not necessary that an indictment for conspiracy state how, why, or wherein the act alleged as an overt act operated, or would or could operate, to aid in the execution or furtherance of the conspiracy. Count 1, after stating the official station and duties of Beavers, and also the office and agency held by Green in and with the International Time Recorder Company, and its business, the sale of time recorders, and the fact that Green, as president and agent of said company, undertook to sell and furnish, and did sell and furnish, to the United States, through Beavers, while Beavers was such officer and during the time mentioned, large numbers of such time-recording devices for the use of the first and second class post offices of the United States, says:

"That during the period aforesaid, to wit, on the first day of November, in the year of our Lord nineteen hundred and one, at Washington aforesaid, in the said District of Columbia, the said George W. Beavers (then still being general superintendent as aforesaid) and the said George E. Green unlawfully did conspire, combine, confederate, and agree together, and with divers other persons to the grand jurors aforesaid unknown, knowingly to defraud the said United States in the manner following; that is to say: The said George E. Green then and there did promise and agree with the said George W. Beavers, in behalf of the said International Time Recorder Company, that upon each and every time-recording device of the kind aforesaid then and thereafter ordered from the said International Time Recorder Company, through the procurement and influence of the said George W. Beavers, while he, the said George W. Beavers, continued to be an officer as aforesaid and a person acting as aforesaid, the International Time Recorder Company would pay to the said George W. Beavers, for his own private use and benefit, a commission of ten per cent. of the purchase price thereof, whereby," etc.

Here, with the word "thereof," ends the statement of the agreement made between Green and Beavers. This agreement was the conspiracy, so far as charged directly. Then follows:

"Whereby" (meaning, evidently, by the making and execution of such agreement) "the said United States would be and were defrauded of the sums of money so paid as commissions, by reason of the fact" (now follows a statement of what is alleged to be a fact, viz.:) "that but for the payment thereof" (said commissions), "and but for the said unlawful agreement and its exe-

·cution" (the agreement of Green in behalf of the company to pay Beavers, for his own use and benefit, 10 per cent. upon all sales made to the government, and the actual payment thereof) "the said time-recording devices could and would have been procured by the said George W. Beavers in his said official capacity, for the said Post Office Department, at prices less than the prices paid and to be paid therefor by the said Post Office Department by the amount of such commissions at least."

It is insisted that the language:

"The said George W. Beavers and the said George E. Green unlawfully did conspire, combine, confederate, and agree together, and with divers other persons to the grand jurors aforesaid unknown, knowingly to defraud the said United States in the manner following; that is to say: The said George E. Green then and there did promise and agree with the said George W. Beavers"

—Fails to show or state a combination, agreement, and meeting of the minds of Green and Beavers as to Green's proposition, an assent by Beavers, a joint assent of minds, and therefore no conspiracy is charged. Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419.

I do not think this contention can be maintained. The fair import of the language is, and all readers and hearers would understand, that Green not only promised Beavers, but that, on the making of the proposition by Green, he and Beavers agreed, had a meeting of minds; that there was an assent by both to such proposition. True, one may say to another, "I promise," or "I agree with you," and, if that is all there is of the transaction, no agreement is made. This alone is a mere proposal to agree. But when a grand jury or a court says, speaking of what has been proved or established, or of what it charges the fact to be, "G. then and there did promise and agree with B.," the fair import and meaning and construction is that not only did G. promise and propose, but B. accepted and agreed to the proposition. The defendant cannot be misled or prejudiced; for he cannot misunderstand that the indictment intends to charge that he and Beavers mutually agreed together, the one with the other, to do the acts charged. It was not necessary to allege what each said.

It is further insisted that the acts stated as having been agreed upon to be done by Green and Beavers would not, if done, necessarily defraud the United States, and hence a conspiracy to defraud the United States is not alleged. It is claimed that the indictment is no more valid, as charging an offense against section 5440 of the Revised Statutes [U. S. Comp. St. 1901, p. 3676], than it would be had it charged that Green and Beavers agreed and conspired together, and with each other, to defraud the United States in the manner following, that is to say: they, said Green and said Beavers, conspired and agreed together and with each other that they would, before the presidential election, go to Europe, and remain until after election, and so deprive the United States of their votes at the election. It is insisted that an agreement by Green to pay (in behalf of the International Company) to Beavers a sum of money for each sale of a clock device made to the government through his influence could not defraud the government, if executed, unless it

was part of the agreement that the government was to be induced to purchase more of such devices than it needed, or was to be induced or compelled to pay a higher price for such devices than it otherwise would have been required to pay, and that nothing of this kind is found or contained in the alleged illegal agreement. It is also insisted that the agreement did not constitute a conspiracy to defraud, for the reason it is not alleged the parties knew, or understood, or contemplated, that the agreement would or could defraud the United States; that the only purpose fairly inferable is that the government would be induced to purchase the Bundy recorders, rather than others; that, if such was the only purpose of the agreement alleged, it was not a conspiracy to defraud. It is insisted that the agreement as charged, fully executed, would not operate to defraud or have the effect of defrauding the United States, for the reason that there was nothing in the conspiracy agreement that was to affect the price or cost of these time-recording devices to the government. It is insisted that it is absurd to assert that a conspiracy to defraud the United States is stated, when the agreement made (the conspiracy) is such that, if fully executed by the performance of all the acts agreed to be done, the United States would not necessarily be defrauded, unless it was also made a part, and charged to be a part, of the agreement that by doing such acts they would defraud the United States of money, property, or rights.

In this indictment the statement of what was agreed to be done is followed with this allegation:

"Whereby" (referring to the agreement) "the said United States would be and were defrauded of the sums of money so paid as commissions, by reason of the fact that, but for the payment thereof" (the sums agreed to be paid and paid to Beavers), "and but for the said unlawful agreement and its execution, the said time-recording devices could and would have been procured by the said George W. Beavers, in his said official capacity for the said Post Office Department, at prices less than the prices paid," etc.

If so, why? Not because of anything contained in the conspiracy agreement, for nothing on that subject was contained or agreed upon therein. It is not stated that either Green or Beavers knew of or contemplated the above result as the consequence of their conspiracy. It is not alleged that either Green or Beavers knew or had reason to believe the agreement to pay Beavers the said commissions would in any way affect the cost of the time recorders to the government, or that they or either had anything to do with causing that result to be a "fact." They agreed to do a certain act. The doing of that act might and might not lead to a certain result, the defrauding of the United States. If it did lead to such result, it would have been because of further acts done by Green or his company, not, so far as appears, agreed to be done when the conspiracy was formed. Such result was not the natural or probable result of the agreement.

There are many ways of defrauding the United States. Numerous ways and means for accomplishing that result have been devised and others may be devised. Very many acts may be done, each of which, or several of a class of which, when done, would

operate to defraud the United States—some necessarily; obviously others because of peculiar surroundings, circumstances, and conditions. In a criminal indictment charging a conspiracy to defraud the United States, the defendants are entitled to be informed in the indictment of the acts they are charged with having agreed to do, by which the fraud is to be perpetrated or consummated. Pettibone v. United States, 148 U. S. 197–202, 13 Sup. Ct. 542, 37 L. Ed. 419; United States v. Hess, 124 U. S. 483–486, 8 Sup. Ct. 571, 31 L. Ed. 516; United States v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698. The defendants in such an indictment, aside from meeting the overt acts, are required to be prepared to defend themselves against proof that they agreed to do the acts charged as having been agreed to be done. They are not to be called upon —they are not required to be prepared—to show that they did not make or enter into an agreement, the terms of which are not fairly stated or set forth in the indictment. It is not sufficient to charge the crime in the words of the statute, or to state an agreement to do acts which, if done, would not operate to defraud the United States. United States v. Cruikshank et al., 92 U. S. 558, 559, 23 L. Ed. 588, and cases there cited.

This indictment says these parties "knowingly" conspired to defraud the United States in the manner following; and in giving the manner in which the government ,was in fact defrauded it is stated that it was so defrauded—

"By reason of the fact that, but for the payment thereof (such commissions), and but for the said unlawful agreement and its execution, the said time-recording devices could and would have been procured by the said George W. Beavers, in his said official capacity, * * * at prices less than the prices paid and to be paid therefor * * * by the amount of such commissions at least."

It seems to me, while it is true that facts must be alleged, and nothing essential to be stated can be taken by implication or inference (Pettibone v. United States, and United States v. Hess, supra), that it was the plain intention of the pleader to allege, and that it is alleged (defectively, it is true), that time recorders were to be made to cost the government more than they otherwise would, by reason of the agreement, and that it was a part of the agreement, understood and assented to by Green and Beavers, that such should and would be the effect of the agreement when executed. The indictment says the defendants "knowingly" conspired, and conspired and agreed "knowingly, to defraud the said United States, in the manner," etc. I think the indictment fairly charges knowledge on the part of Green and Beavers that, if the commissions were to be paid, the government must pay more for the devices. It will be for the trial court on a demurrer to the indictment, or at some other appropriate stage of the proceedings, to pass on the sufficiency of the indictment, in view of the defects to which attention has been called. It is a matter of considerable doubt whether the defects invalidate the indictment; but, in view of the decision of the Supreme Court in Beavers v. Henkel, 194 U. S. 73, 24 Sup. Ct. 605, 48 L. Ed. 882, and other cases, I am satisfied it is my duty to hold this indict-

ment good for the purposes of this proceeding and motion. As it was put in evidence on the question of probable cause, and furnishes prima facie evidence, and makes a prima facie case, I am not called upon to pass upon the sufficiency of the evidence given aliunde in support of this charge; nor am I called upon to express my opinion as to what the decision of the Supreme Court of the District of Columbia should be as to the sufficiency of the indictment to put the defendants on trial. These questions are for the trial and appellate courts. The true test of the sufficiency of an indictment is—

"Whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." Cochran v. U. S., 157 U. S. 286–290, 15 Sup. Ct. 628, 39 L. Ed. 704; Putnam v. U. S., 162 U. S. 687, 16 Sup. Ct. 923, 40 L. Ed. 1118.

In this case, based on indictment No. 23,940, charge of conspiracy to defraud in connection with the Bundy time recorders, the writ is dismissed, and the defendant remanded. The warrant of removal applied for is granted.

The third indictment above mentioned, No. 23,928, charges that Green and Beavers, each holding the position and being charged with the duties hereinbefore stated, unlawfully conspired and agreed together, on a day named, at Washington, D. C., and with divers other persons to the grand jury unknown—

"Knowingly to commit an offense against the United States in the manner following; that is to say: The said George E. Green then and there did promise and agree with the said George W. Beavers, in behalf of the said International Time Recording Company, that upon each and every time-recording device of the kind aforesaid then and thereafter ordered from the said International Time Recorder Company, through the procurement and influence of the said George W. Beavers, while he, the said George W. Beavers, continued to be an officer as aforesaid, the said International Time Recorder Company would pay to the said George W. Beavers, for his own private use and benefit, a commission of ten per cent. of the purchase price thereof."

The indictment then charges an overt act by Beavers, to wit, the writing, etc., of a letter to procure the ordering and purchasing of one or more of these time recorders in execution of the said agreement and conspiracy. The other counts of this indictment, so far as they charge a conspiracy, are the same; for they refer to count 1 for a statement of the conspiracy agreement.

This indictment is defective, if substantially defective, in that it fails to charge a conspiracy to defraud the United States, or to commit any other offense against the United States, for the reason that it fails to state, if it does so fail, an agreement to perform acts which, if done, would constitute a crime against the United States. As already pointed out, it is not sufficient to state this offense in the words of the statute. "When the criminality of a conspiracy consists in an unlawful agreement of two or more persons to compass or promote some criminal or illegal purpose, that purpose must be fully and clearly stated in the indictment." Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419. There are scores of statutory offenses or crimes against the United States.

136 F.—42

The defendants are entitled to know in any event what particular offense or crime they are charged with having conspired or agreed to commit. In some cases the defendants would be entitled to be informed of the specific acts agreed to be performed. Here we find a statement of acts agreed to be done.

As we have seen in considering indictment No. 23,927, it is a crime against the United States, under section 5451 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3680], to promise, or offer, or give, or to procure to be promised, offered, or given, any money or thing of any value to any officer of the United States, or to any person acting for or in behalf of the United States in any official function, etc., "with intent to influence his decision or action on any question, matter, cause or proceeding which may at any time be pending or which may by law be brought before him in his official capacity  *  *  *  or to induce him [said officer] to do or omit to do any act in violation of his lawful duty." The doing of the acts, etc., above mentioned, do not constitute an offense against the United States unless done with the intent specified. Intent in some cases may be inferred. A man is presumed to intend the natural or known result of his act. Still an indictment for the commission of a statutory offense, when a particular intent is made a substantial element of the crime, must state the intent. United States v. Cruikshank, 92 U. S. 558, 23 L. Ed. 588. It is there held:

"A crime is made up of acts and intent; and these must be set forth in the indictment with reasonable particularity of time, place, and circumstance."

"The general rule in reference to an indictment is that all the material facts and circumstances embraced in the definition of the offense must be stated, and that, if any essential element of the crime is omitted, such omission cannot be supplied by intendment or implication. The charge must be made directly, and not inferentially, or by way of recital." Pettibone v. United States, 148 U. S. 202, 13 Sup. Ct. 542, 37 L. Ed. 419; United States v. Hess, 124 U. S. 483–486, 8 Sup. Ct. 571, 31 L. Ed. 516.

It is true that the manner or mode of committing the offense is stated in the indictment. Green, in behalf of the company represented by him, is to pay, or the company is to pay, to Beavers a commission of 10 per cent. upon each and every device sold the government through the influence of Beavers while he remains such officer. The International Time Recorder Company is to pay the commission to Beavers; it may be through Green; it may be through some other agency. Beavers agrees to receive it. The meeting of minds is sufficiently charged, as I have already held in considering the indictment charging these same defendants with the crime of having, on the same day, by making this same agreement, conspired to defraud the United States. Beavers does not agree to be active and use his influence in any way to secure the purchase of time recorders. He cannot purchase one. He has not that power. It is not stated that Green and Beavers agreed, or that either proposed, that this agreement for the payment of commissions was to influence the action of Beavers as an officer of the government, or as a person employed to perform an official function in one of the departments, or was made for that purpose, or that either had such a result in mind. Nor was it agreed, or stated, or

understood that such agreement was made for the purpose of inducing Beavers to do or to omit to do any act in violation of his duty. For the intent we are left to surmise, conjecture, and infer-ence. Did not Green intend the promise of the money should have the effect named? Did not Beavers fully understand the money was offered, and that it was to be paid for that purpose? Did not Beavers, in assenting to the agreement, understand it was proposed—impliedly consent—that he would use his influence to procure the purchase of devices by the government? This may be, and may not be.

It is evident to any rational mind that under the decisions of the Supreme Court an indictment purporting to charge a conspiracy to "commit an offense against the United States," which is merely the general name of the crime, must state an agreement to do acts which, if done, would constitute a crime or offense against the United States. The acts to be committed or done must be stated, and, if the conspiracy be one to commit a crime, where the acts done constituting the crime must be done with an intent specified in the statute, then the indictment for the conspiracy must allege an agreement not only to do the acts, but to do those acts with the intent, or for the purpose embraced within the intent, specified in the statute creating the offense. The existence of the intent cannot be left to inference. It is as essential to allege the intent as to allege the acts. United States v. Cruikshank et al., 92 U. S. 558, 23 L. Ed. 588. This indictment fails wholly to state facts which, admitted to be true, show the commission of a crime, or probable cause to believe that George E. Green has been guilty of the commission of the crime charged, or of any crime. A careful reading of the testimony given before the commissioner demonstrates that, for reasons already given, there is no evidence, aside from the indictment, even tending to show the commission of the crime charged or of any crime, or probable cause to believe the defendant, George E. Green, guilty of the crime charged, or of any crime.

On this charge of conspiracy to commit an offense against the United States in connection with the Bundy time recorders, in violation of section 5440 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3676], and which charge is based on indictment No. 23,928, filed September 17, 1903, the writ of habeas corpus is sustained, and the defendant is discharged. The motion for a warrant of removal is denied.

In respect to indictment No. 23,961, filed October 5, 1903, charging a conspiracy to defraud the United States in violation of section 5440, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3676], in relation to the Doremus stamp-canceling machine, in which George W. Beavers, George E. Green, and Willard D. Doremus are defendants, and indictment No. 23,960, against George E. Green and said Doremus, filed the same day, and charging the bribery or attempted bribery of George W. Beavers, in violation of section 5451, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3680], in connection with the sale of said machines to the government, but little need be said. Indictment No. 23,961, and the charge based therein, must be sustained, for the same

reasons indictment No. 23,940 was sustained; the difference being that indictment charged a conspiracy to defraud in relation to the Bundy time recorders. Indictment No. 23,960 must be sustained for the reason that it charges distinctly the offering of money to Beavers and its actual payment in the District of Columbia, with the necessary intent, whereas the bribery indictment before considered and held invalid alleges the offering of checks.

As to indictments No. 23,960 and No. 23,961, and the charges based thereon, the writs are dismissed, and the defendant remanded. In both these cases the warrants of removal applied for are granted.

It has been suggested that under the decision in Beavers v. Henkel, supra, it has become the duty of commissioners and judges, on the presentation of an indictment found by a grand jury in another district and proof of identity, to direct the removal of the indicted party to that jurisdiction, without presuming to question the validity of the indictment, or taking or hearing evidence offered to establish the innocence of the defendant in the indictment. Some expressions in the opinion in that case might seem to sustain that contention, but it must be remembered that the court there was considering a case where the validity of the indictment itself was not in question. All the court said was on the assumption that the indictment was valid. The question was its effect, or the probative force to be given it on that assumption. A void indictment— that is, one void on its face, for the reason it does not charge the commission of a crime—is not prima facie evidence to an intelligent court or judge of anything, except that the person who drew it and the grand jury that found it made a mistake. It will be a sad day for the cause of justice when it is decreed by Congress or the courts that a citizen may be removed from Maine to California for trial on a void indictment. That question may be determined by the court where the arrest is made; for it is jurisdictional. The proper way to test the question is by a writ of habeas corpus. That writ cannot be made to serve the purpose of an appeal or of a writ of error, but it is properly used to determine whether a person under arrest is held lawfully. If held by virtue of a void indictment, or a process or warrant issued and based thereon, he is not, of course, in this Republic, lawfully detained and deprived of his liberty. In each of the cases where I have sustained the writ and directed the discharge of the defendant, I have found and hold that there is no evidence, taking the facts stated in the indictment as true, either that the crime alleged has been committed, or that there is probable cause to believe the defendant, Green, guilty of the commission of that or any other crime. He is therefore illegally held and deprived of his liberty.